**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| RSR ART, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil No. 1:17-cv-01077-LO-TCB |
| v. | ) | |
| | ) | |
| BOB ROSS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT BOB ROSS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE......................................... 2

ARGUMENT ................................................................................................................ 13

  A. THE SUMMARY JUDGMENT STANDARD......................................13

  B. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF
    BRI AS PLAINTIFF DOES NOT OWN THE RIGHTS IT SEEKS TO
    ENFORCE AND THUS HAS NO STANDING TO BRING THIS
    ACTION ..............................................................................................14

    1. The *Nunc Pro Tunc* Assignment Failed to Remedy the Gap in the
     Chain of Title to the Bob Ross Intellectual Property such that Steve
     Ross had No Rights to Convey to RSR Art. ................................15

    2. The Agreements Executed Before and After Bob Ross's Death
     Conclusively Establish BRI's Ownership of the Bob Ross-related
     Intellectual Property..................................................................18

  C. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF
    BRI ON COUNTS I AND II OF THE COMPLAINT AS PLAINTIFF'S
    CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS .................22

    1. Plaintiff's Right of Publicity Claim at Count II of the Complaint Is
     Barred by the Statute of Limitations..........................................22

    2. Plaintiff's Claim at Count I of the Complaint for False
     Representation Under Section 43(a) of the Lanham Act is Barred
     by the Statute of Limitations......................................................25

  D. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF
    BRI AS PLAINTIFF'S CLAIMS ARE BARRED BY THE DOCTRINE
    OF LACHES......................................................................................25

CONCLUSION............................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraxis Bioscience, Inc. v. Navinta LLC*,
    625 F.3d 1359 (Fed. Cir. 2010)................................................................................15, 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)..........................................13

*Arachnid, Inc. v. Merit Indus., Inc.*,
    939 F.3d 1574 (Fed. Cir. 1991)................................................................................18

*Bentley Funding Group, LLC v. SK&R Group, LLC*,
    296 Va. 315 (2005) ..................................................................................................19

*Blair v. Nevada Landing Partnership*,
    859 N.E.2d 1188 (Ill. App. Ct. 2d Dist. 2006)........................................................23

*Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Ouest De La France*,
    245 F.3d 1359 ..........................................................................................................30

*Brittingham v. Jenkins*,
    914 F.2d 447 (4th Cir. 1990) ...................................................................................26

*In re CTP Innovations, LLC*,
    2016 WL 6996738 (D. Md. Nov. 29, 2016) ...........................................................16

*Enzo Apa & Sons, Inc. v. Geapag A.G.*,
    134 F.3d 1090 (Fed. Cir. 1998)................................................................................18

*Equal Access Educ. v. Merten*,
    325 F.Supp. 2d 655 (E.D. Va. 2004) .......................................................................14

*Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*,
    293 Va. 113 (2017) ..................................................................................................22

*Gaia Techs., Inc. v. Reconversion Techs., Inc.*,
    93 F.3d 774 (Fed. Cir. 1996)....................................................................................18

*Glynne v. Wilmed Heathcare*,
    699 F.3d 380 (4th Cir. 2012) ...................................................................................16

*Goodman v. Resolution Trust Corp.*,
    7 F.3d 1123 (4th Cir. 1993) .....................................................................................19

*Hospelhorn v. Corbin*,
    179 Va. 348 (1942) ..........................................................................................22

*Johnson v. McKee Banking*,
    398 F.Supp. 201 (W.D. Va. 1975), *aff'd*, 532 F.2d 750 (4th Cir. 1976) ................................13

*Lavery v. Automation Mgmt. Consultants, Inc.*,
    234 Va. 145 (1987) ..........................................................................22, 23, 24

*Lingo Corp. v. Topix, Inc.*,
    No. 01 Civ. 2863(RMB), 2003 WL 223454 (S.D.NY. Jan. 31, 2003) ....................................17

*Link Associates v. Jefferson Standard Life Ins. Co.*,
    223 Va. 479 (1982) ..........................................................................................21

*Long Term Care Partners, LLC v. United States*,
    516 F.3d 225 (4th Cir. 2008) ...............................................................................14

*Louisville & N.R. Co. v. Saltzer*,
    151 Va. 165, 144 S.E. 456 (1928) .........................................................................22

*Manifatture 7 Bell S.P.A. v. Happy Trails LLC*,
    174 F. Supp. 3d 863, 118 U.S.P.Q.2d 1596 (D. Del. 2016)..............................................23

*Miller v. Glenn Miller Productions*,
    318 F Supp. 2d 923 (C.D. Cal. 2004), *aff'd* 454 F.3d 975 (9th Cir. 2006)..............................29

*PBM Products, LLC v. Mead Johnson & Co.*,
    639 F. 3d 111 (4th Cir. 2011) .......................................................................25, 26, 28

*Porter v. United States*,
    919 F. Supp. 927 (E.D. Va. 1996) .........................................................................14

*Putnam Berkley Group, Inc. v. Dinin*,
    734 So.2d 532 (Fla. 4th DCA 1999) ......................................................................24

*RAD Data Commc'ns, Inc. v. Patton Elecs. Co.*,
    882 F. Supp. 351 (S.D.N.Y. 1995) ........................................................................15

*Reynolds Consumer Prods., Inc. v. Handi-Foil Corp.*,
    2014 WL 3615853 (E.D. Va. July 18, 2014) (O'Grady, J.)..............................................25

*Stewart v. Lady*,
    251 Va. 106 (1996) ..........................................................................................25

*Street v. Consumers Mining Corp.*,
    185 Va. 561, 39 S.E.2d 271 (1946).........................................................................22

*U-Haul Int'l, Inc. v. WhenU.com*,
    279 F. Supp 2d 723 (E.D. Va. 2003) ......................................................................13

*Verizon Va. LLC v. XO Communs., LLC*,
   144 F. Supp. 3d 850 (E.D. Va. 2015) .................................................................19

*Visa U.S.A. Inc. v. First Data Corp.*,
   No. C 02-01786 JSW, 2006 U.S. Dist. LEXIS 18482 (N.D. Cal. Aug. 16,
   2005) .....................................................................................................................14

*Wallace Intern. Silversmith's, Inc. v. Stanley Roberts, Inc.*,
   No. 87 CIV. 3574 (WK), 1990 WL 123793 (S.D.N.Y. Aug. 8, 1990)....................17

*What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Texas*,
   357 F.3d 441 (4th Cir. 2004) ...............................................................................26

**Statutes**

15 U.S.C. § 1072 ........................................................................................................30

Fla. Stat. § 95.11 .......................................................................................................24

Fla. Stat. § 95.11(3)(p) .............................................................................................24

Fla. Stat. § 540.08 .....................................................................................................24

Lanham Act Section 43(a) .........................................................................................24

Va. Code Ann. § 8.01-40(A).................................................................................22, 24

Va. Code Ann. § 8.01-230 .........................................................................................22

Va. Code Ann. § 8.01-243(E) ...............................................................................22, 23

**Other Authorities**

Fed. R. Civ. P. 12(b)(1), 12(h)...................................................................................14

Fed. R. Civ. P. 56 ........................................................................................................1

Defendant, Bob Ross, Inc. ("BRI" or "Defendant"), by counsel and pursuant to Fed. R. Civ. P. 56, and Local Rules 7 and 56, submits this Memorandum of Law in support of its Motion for Summary Judgment as to Counts I through III of the Complaint filed by Plaintiff, RSR Art, LLC ("RSR Art" or "Plaintiff") in this action.

## INTRODUCTION

Bob Ross, the late artist and painting instructor, is an American icon.  His landscapes and "Happy Trees" have inspired generations of budding artists to pursue their ambitions to "paint like Bob."  With the financial backing and moral support from his friends Walter and Annette Kowalski, Bob Ross became a household brand.  Together, they formed a company in 1984, aptly named "Bob Ross, Inc." ("BRI"), to market and promote Bob Ross to the American public. In its earliest days, BRI developed what would become an immensely popular and long-running public television series, "The Joy of Painting" featuring Bob Ross, which brought Bob Ross's painting classes into the living rooms of millions of viewers across the country.  From there, the Bob Ross brand, fueled by BRI's efforts and licensing activities, expanded over the ensuing three decades into dozens of product categories, from instructional videos and companion books to art and painting supplies and a host of merchandise items.  BRI also created and implemented the highly successful "Certified Ross Instructor," or "CRI" program to teach aspiring artists Bob Ross's signature "wet-on-wet" painting technique.  Even though Bob Ross passed away in 1995, BRI has "kept his flame alive" by continuing to bring Bob Ross's unique style and persona to a new generation of fans.

Though RSR Art, the Plaintiff in this action, has been in existence for little over a year, its three founders and principals – Robert Stephen Ross (Bob Ross's son, known as "Steve"), Lawrence Kapp, and Dana Jester – are no strangers to the Bob Ross world.  For two decades,

1

each of them was actively involved and participated in BRI's activities to promote Bob Ross. Only recently, when BRI cut a deal to stream "The Joy of Painting" series over Netflix and Twitch, did Messrs. Kapp, Jester and Steve Ross decide to take action.  Through a series of contrived assignments, they attempted to wrest ownership and control of the Bob Ross brand from BRI and lay claim to the fruits of BRI's labors.  The present lawsuit is the latest effort by the Kapp-Jester-Steve Ross trio to claim and reap the benefits of rights they do not own and have never owned.  The Court should not permit those efforts to continue, but rather grant summary judgment in favor of BRI on all counts of Plaintiff's Complaint.

### STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

Construed in the light most favorable to Plaintiff, and with Defendant reserving the right to contest these facts as appropriate at trial, the undisputed facts of this case are as follows.

1.      Robert Norman "Bob" Ross ("Bob Ross") was a well-known American painter, art instructor, and television host.  Complaint, ¶ 9; Answer, ¶ 9.

2.      In or about 1981, Bob Ross met Walter and Annette Kowalski in Florida when Annette enrolled in one of Bob Ross's painting classes.  They struck up a friendship and, after some discussions, agreed to go into business together.  Declaration of Walter Kowalski, dated July 18, 2018 ("W. Kowalski Dec."), ¶¶ 4-5.

3.      BRI was incorporated in Virginia on December 6, 1984 by Bob Ross, his wife Jane Ross, Walter Kowalski, and Annette Kowalski.  The purpose of BRI as stated in its Articles of Incorporation was "to engage in the business of promoting artistic activities for commercial purposes and, additionally, to conduct business of any character whatsoever that is not prohibited by law or required to be stated in the Articles of Incorporation."  In reality, the entire purpose of

---

[1] All citations herein to the Statement of Material Facts Not in Dispute are to the abbreviation "SUF, ¶ __."

BRI was to promote the artist Bob Ross through any and all commercial means and media available.  W. Kowalski Dec., ¶ 9; Ex. A to Declaration of David G. Barger, dated July 20, 2018 ("Barger Dec.").

4.      The ownership of BRI was equally divided among the incorporators, such that Bob Ross, Jane Ross, Walter Kowalski, and Annette Kowalski each owned twenty-five percent (25%) of the corporation.  W. Kowalski Dec., ¶ 10,

5.      In addition to being a part owner, Bob Ross was also an employee of BRI and served as its President.  He was listed in BRI's employee payroll records as an employee and received a regular salary plus benefits.  Bob Ross also received a Form W-2 on an annual basis from 1986 through 1995.  W. Kowalski Dec., ¶ 11; Barger Dec. Ex. B.

6.      From the period of 1986 to 1992, BRI applied for and obtained five (5) U.S. trademark registrations consisting, in whole or in part, of the name and likeness of Bob Ross. For each five (5) applications filed by BRI, Bob Ross executed written consents authorizing BRI to register all or part of his name and/or likeness as a trademark (or part of a trademark).  W. Kowalski Dec., ¶ 14; Barger Dec. Exs. C-G.

7.      From the outset of its business through the present, BRI has sold or licensed consistent with its legal rights, among other things, artists' supplies, instruction books and videos relating to the artist Bob Ross.  Complaint, ¶ 17; Answer, ¶ 17.

8.      On August 4, 1989, BRI entered into a License Agreement with an art supply manufacturer, Martin F. Weber Co. ("MFW"), whereby BRI granted to MFW a license to manufacture and sell art products "***bearing the name 'Bob Ross', likeness and biographic material of Robert N. Ross, who has assigned all the same to BRI***, and to the trademark and logo for 'Bob Ross' as owned by BRI."  (emphasis added)  The License Agreement further states

3

that "***All other rights not specifically licensed to MFW hereunder are fully reserved to and retained by BRI, and BRI is and shall be the owner of all package design incorporating the name 'Bob Ross', likeness, biographic material, trademark or logo.***" (emphasis added)  Bob Ross was aware of and consented to these uses of his name and likeness.  W. Kowalski Dec., ¶ 20; Barger Dec. Ex. H.

9.     During Bob Ross's lifetime, BRI also sold or licensed and promoted a wide variety of items, including but not limited to T-shirts, ballpoint pens, bumper stickers, coffee mugs, letter openers, aprons, holiday cards, post cards, pins, lunch sacks, visors, tote bags, wrist watches, refrigerator magnets, lab coats.  Bob Ross was aware of and encouraged BRI to sell or license all of these items.  The items displayed either Bob Ross's name or likeness, or both.  In many instances, Bob Ross himself came up with the idea to promote or merchandise the item. W. Kowalski Dec., ¶ 16; Declaration of Joan Kowalski, dated July 19, 2018 ("J. Kowalski Dec."), ¶ 17.

10.     During the early 1990's, Bob Ross was active in exploring and promoting BRI to sell and license a line of collectible plates with Bob Ross's image on them.  Bob Ross was also involved and instrumental in exploring Bob Ross gifts and collectibles, such as fragrance bottles, figurines, paperweights, wooden boxes with soap, tiles, and a raccoon that would all together be referenced as the "Bob Ross Collection."  W. Kowalski Dec., ¶ 19.

11.     Beginning in the 1980's and continuing into the 1990's, BRI developed a television series titled "The Joy of Painting" featuring Bob Ross.  The series consisted of Bob Ross demonstrating his painting techniques to teach viewers how to "paint like Bob."  The series was broadcast via the Public Broadcasting Service ("PBS") through its Muncie, Indiana-based affiliate, WIPB-TV.  There were approximately 31 series, and 403 episodes and 35 companion

books for the episodes.  W. Kowalski Dec., ¶ 21.

12.    The terms of the agreement between BRI and WIPB-TV with respect to "The Joy of Painting" television series were set forth in a Contract dated July 1, 1990.  The Contract provided in pertinent parts as follows:

- Under the section titled "Standard Operating Procedure" (Paragraph 4), the Contract states that BRI "has developed art instructional series" and "developed and published a companion book," and that "[a]ll of such work has been developed for BRI as 'work for hire' by Robert N. Ross (including program appearance) and by others, and all copyrights for which are owned outright by BRI."

- Under the section titled "Series Ownership" (Paragraph 8), the Contract states as follows:  "All ownership rights, including but not limited to all series-related copyrights (including the programs, series, books and art), master tapes, scripts, transcripts, and on-air produced paintings, are vested solely in BRI.  Such rights vested in BRI include, but are not limited to all domestic, foreign, English language, foreign language, electronic media, print media, mixed media, non-electronic media, broadcast, non-broadcast, derivative, and other rights of every kind and character."

- Under the section titled "Copyrights" (Paragraph 22), the Contract states as follows:  "All series, programs, tapes, masters, duplicates, books, copies and other copyrightable materials developed, produced or otherwise generated in the course of performance of this Contract shall bear the notice "© Copyright [Year] by Bob Ross Inc.  All Rights Reserved."

  W. Kowalski Dec., ¶ 22; Barger Dec. Ex. I.

13.    Thereafter, BRI and WIPB-TV entered into a Letter Agreement, dated December 12, 1990, regarding production and distribution of "The Joy of Painting" Series 23 and companion book.  The Letter Agreement, which is on BRI letterhead and signed by Bob Ross as President of BRI, provides in pertinent parts as follows:

- "[o]wnership of the programs, the copyright and all other rights vests immediately in Bob Ross Inc." and that BRI "shall retain ownership rights represented by the programs, the title, and copyrights for the book", and

- incorporates by reference, among other paragraphs, Paragraphs 4 ("Standard Operating Procedure"), 8 ("Series Ownership"), and 22 ("Copyrights") of the Contract dated July 1, 1990 between BRI and WIPB-TV.

W. Kowalski Dec., ¶ 23; Barger Dec. Ex. J.

14.　　In a four-page typed memo and accompanying handwritten note to Walter Kowalski dated September 15, 1993 (the "September 15, 1993 Memo"), Bob Ross discussed his ideas for a painting stage show in Branson, Missouri.  Under the category of "MERCHANDISING," Bob Ross discussed "items to offer," including "…videos, relaxation therapy tapes featuring Bob's voice, Tee-shirts, baseball caps, vest, aprons, easels, soap-on-a-rope – a full range of tourist items."  Bob Ross also discussed offering items geared toward children, including, "coloring books, puppets, clothes, bedspreads, towels, toothbrushes and on and on---."  W. Kowalski Dec., ¶ 17 and Ex. 1 thereto.

15.　　In the September 15, 1993 Memo, Bob Ross stated that "[t]he greatest asset we [BRI] own is the Bob Ross name and image."  W. Kowalski Dec., ¶ 18 and Ex. 1 thereto.

16.　　Bob Ross died on July 4, 1995.  Complaint, ¶ 9; Answer, ¶ 9.

17.　　When Bob Ross died, and as part of a contract entered into by the owners of BRI on December 12, 1989 entitled Cross-Purchase Agreement, and an Amendment thereto dated July 11, 1994 (the "Cross-Purchase Agreement"), the remaining shareholders of BRI, Walter and Annette Kowalski, acquired all of Bob Ross's shares and his entire interest in BRI at the value set in the Cross-Purchase Agreement for his shares, which was one-third of $2 million, *i.e.*, $666,666.67.  W. Kowalski Dec., ¶ 24 and Ex. 2 thereto.

18.　　In January 1997, BRI obtained two (2) federal trademark registrations that featured the "Bob Ross" name:  U.S. Trademark Registration No. 2,028,460 for the mark BOB ROSS (in stylized script) for "pre-recorded video tapes featuring instruction on painting methods" in Class 9, and for "artistic materials, namely, plastic beater racks for cleaning paint brushes, instructional art books and paint brushes" in Class 16; and U.S. Trademark Registration

6

No. 2,029,815 for the mark BOB ROSS ART WORKSHOP & GALLERY for "providing courses of instruction in painting and artwork" in Class 41, and for "retail store services featuring art supplies and artwork," in Class 42.  Barger Dec. Exs. K, L.

19.     In April 1997, BRI settled a dispute with the Estate and the Trust that arose after Bob Ross's death over who held title to and ownership of works created by Bob Ross as an employee of BRI, including paintings and books prepared in connection with Series 1 through 31 of "The Joy of Painting."  The Settlement Agreement between BRI, the Estate, and the Trust provides in pertinent parts as follows:

■   Under Section 2 of the Settlement Agreement titled "BRI Title Confirmation," Section 2(a) states as follows:  "FIDUCIARIES [defined to include the Trust and the Estate] acknowledge that, to the best of the knowledge of FIDUCIARIES, BRI has sole and exclusive ownership of all rights in and to all of the creative works of [Bob Ross] and excepting any transfer, assignment, or other action made by BRI or [Bob Ross] during his lifetime.  Reciprocally, BRI warrants that to the best of its knowledge, all of such creative works were prepared by [Bob Ross] as 'works made for hire' on behalf of BRI and so made by [Bob Ross] as an employee of BRI, for which [Bob Ross] was paid a regular salary plus other benefits during his lifetime.  BRI further warrants to have substantial and substantive documentation for such relationships and for such creation as 'works made for hire.'"

■   Section 2(b) states as follows:  "The FIDUCIARIES acknowledge, that to the best of the knowledge of the FIDUCIARIES, BRI has all the ownership and rights in and to all copyrights in a television series and television programs known as 'The Joy of Painting' aka 'The Joy of Painting with Bob Ross' (excluding Series I thereof) and in all of the companion books and other writings and memorializations in any media related to the production, promotion or distribution thereof, including but not limited to book texts, scripts, on-air commentary, manuals, articles, instructions and explanations for all of the said series, as well as ownership of all the trademarks registered to BRI and derivatives thereof, all excepting any transfer, assignment, or other action made by BRI or [Bob Ross] during his lifetime."

■   Section 2(c) states as follows:  "If any such rights or incidents of ownership in and/or to any of the foregoing copyrights, trademarks, publications, television series, creative works or other assets of BRI of any kind or character have somehow vested in the FIDUCIARIES or could be claimed as vesting in the FIDUCIARIES or could be claimed as assets of the FIDUCIARIES, the FIDUCIARIES hereby convey, transfer and assign all such rights and incidents of ownership and claims and ownership itself to BRI, further warranting that neither the FIDUCIARIES nor anyone of the FIDUCIARIES has done

7

any act to encumber any part or all thereof.  Such conveyance transfer and assignment is detailed and confirmed in the 'Assignment & Confirmation By Estate of Robert N. Ross."

- ■ Section 7(a) states as follows:  "FIDUCIARIES and BRI will enter into a Mutual Release of any and all claims between FIDUCIARIES and BRI, including but not limited to those arising out of the ownership of personal property transferred hereunder and including all matters whether or not included in this Agreement (except as reserved herein or in the Mutual Release between FIDUCIARIES and BRI)."

Barger Dec. Ex. M.

20.      BRI and the Estate also entered into an agreement titled "Assignment & Confirmation by Estate of Robert N. Ross" dated April 30, 1997 (hereinafter, the "Assignment & Confirmation").  In the Assignment & Confirmation, the Estate confirms the following based on its "own investigations and observations":

- ■ Bob Ross "was himself an officer, director, salaried employee, shareholder and co-founder of BRI, a Virginia corporation."

- ■ "All artworks created by [Bob Ross] after the founding of BRI on Feb. 6, 1985, were created by [Bob Ross] as works for hire in his capacity as an employee of BRI, for which [Bob Ross] received salary, bonuses, health insurance, fringe benefits, expense reimbursements and other forms of compensation and consideration."

- ■ "All said television programs and television series and all companion books and other writings and memorializations in any media related to the production, promotion or distribution thereof, including but not limited to book text, scripts, on-air commentary, manuals, articles, instructions and explanations, as created by [Bob Ross], solely or with others, were created as works for hire in his capacity of an employee of BRI, or were irrevocably assigned by BRI by [Bob Ross] if otherwise created, in consideration for all of which [Bob Ross] received salary, bonuses, health insurance, fringe benefits, expense reimbursements and other forms of compensation and consideration, and are thus and in fact the sole property of BRI."

- ■ "All rights and ownership in and to all of the said Trademarks listed on the attached Schedule B are vested in BRI."

- ■ "ESTATE will not, alone or with others, directly or indirectly, challenge any of BRI's said ownership or rights in or to any or all of the foregoing copyrights, trademarks, artworks, television programs, television series, books, companion books or other assets of BRI, nor attempt to or in fact procure, support, aid, encourage or promote any such challenge."

- "To the extent, if any, any such rights or incidents of ownership are somehow vested in ESTATE, ESTATE hereby conveys, transfers and assigns all such rights and incidents of ownership and ownership itself to BRI."

Barger Dec. Ex. N.

21.    Also on April 30, 1997, BRI entered into separate Mutual Releases with the Trust and the Estate, each of which provides in pertinent part as follows:

- "The Parties, jointly and severally, do, now and forever, absolutely and irrevocably, hereby release each other in and from any and all claims, suits, liabilities, complaints, losses, damages, and charges of every kind and character arising prior to the date of execution hereof."

Barger Dec. Exs. O, P.

22.    Over the ensuing twenty (20) years following the 1997 Settlement, BRI engaged in numerous activities to promote the artist Bob Ross, his painting and instructional classes. Since as early as 1983, BRI has openly been offering and selling to the public a wide variety of art and painting supplies and other merchandise that bears the Bob Ross name and likeness, filling telephone orders for such products placed by consumers through its toll-free number, 1-800-BOB-ROSS (1-800-262-7677) and, since 1996, through its website www.bobross.com. Further, BRI has for many years, and at a considerable expenditure of time, money, and resources, vigilantly policed its rights in the Bob Ross-related intellectual property by aggressively pursuing third parties who violated those rights.  In 2015, BRI negotiated the arrangements to stream episodes of "The Joy of Painting" on Netflix and Twitch, resulting in renewed interest in and increased popularity of Bob Ross.  And from the outset of its business to the present, BRI has licensed numerous third parties to manufacture and sell products bearing Bob Ross's name and likeness, including a deal in 2016 with Firefly Brand Management to build further on the popularity and goodwill of the Bob Ross brand.  J. Kowalski Dec., ¶¶ 12-22; Deposition of Lawrence Kapp, dated May 4, 2018 ("Kapp Dep.") at 309:13-310:11 (Barger Dec.

9

Ex, Q); Deposition of Robert Stephen Ross, dated May 7, 2018 ("Ross Dep.") at 20:14-21:15, 22:8-23:7 (Barger Dec. Ex. R).

23.     On August 14, 2012, BRI was issued U.S. Trademark Registration No. 4,190,723 for the mark BOB ROSS WET-ON-WET TECHNIQUE for "educational services, namely, conducting classes and workshops in the fields of artistic painting and distribution of training materials in connection therewith" in Class 41.  Barger Dec. Ex. S.

24.     On March 9, 2017, BRI received a letter (the "March 9, 2017 Letter") (Barger Dec. Ex. T) from Mark V. B. Partridge, Esq. on behalf of an entity called "RSR Art, LLC."  In that letter, Mr. Partridge asserted that his client (the Plaintiff herein) owned rights in the "Bob Ross Intellectual Property" by virtue of a document titled "First Amendment to the Robert N. Ross Revocable Trust" (the "First Amendment"), executed by Bob Ross on May 25, 1995.  The First Amendment states that the Trust "shall assign" to Jimmie Cox a fifty-one percent (51%) interest, and to Steve Ross a forty-nine percent (49%) interest, in the "Bob Ross Intellectual Property," which is defined as follows:

> [A]ll rights, title, interests, goodwill, artist's moral rights, resale royalty rights, and renewal rights, whether vested, statutory, common law, contingencies, or expectancies in any and all ***intellectual property of which [Bob Ross] is deemed by law to be the sole or joint author, creator, artist, performer or owner***, including, but not limited to, ***copyrights and trademarks regarding [Bob Ross's] name, likeness, voice***, ***and visual, written or otherwise recorded works***.  (emphasis added)

Barger Dec. Ex. U.

25.     In his March 9, 2017 Letter, Mr. Partridge also asserted RSR Art, LLC owned rights in the "Bob Ross Intellectual Property" by virtue of the following assignments:

■ An "Assignment of Rights and Interests in Intellectual Property" executed by Bob Ross on May 25, 1995, whereby he, in his individual capacity, assigns to himself, as Trustee of the Trust, the "Bob Ross Intellectual Property" as defined in the First Amendment (Barger Dec. Ex. V);

- An assignment, dated October 27, 2016, by Jimmie Cox to Steve Ross of all of Cox's right, title and interest in all that was bequeathed to or otherwise received by Cox from the Trust (hereinafter, the "Cox Assignment"), "including, without limitation, the goodwill, artist's moral rights, resale royalty rights, revocation and renewal rights, and *all other intellectual property, such as rights of publicity, copyright, trademark, service mark all other rights regarding [Bob Ross's] name, image, likeness, voice, and any indicia by which he could be recognized"* (emphasis added) (Barger Dec. Ex. W); and

- An assignment, dated February 10, 2017, by Steve Ross to RSR Art, LLC of all of his right, title and interest that was bequeathed to or otherwise received by him from the Trust or the Cox Assignment in the "Bob Ross Intellectual Property," which is defined by using the same definition that appears in the First Amendment. (Barger Dec. Ex. X)

26.    At no time prior to his death on July 4, 1995 did Bob Ross, as Trustee of the Trust, cause the Trust to assign to either Jimmie Cox or Steve Ross any interest in or to the "Bob Ross Intellectual Property" as defined in the First Amendment. (Entire record)

27.    Nearly three (3) months after Mr. Partridge's assertion in the March 9, 2017 Letter of RSR Art, LLC's alleged rights in the "Bob Ross Intellectual Property," on May 26, 2017, Jimmie Cox, as Trustee of the Trust, executed on behalf of the Trust a "*Nunc Pro Tunc Assignment and Transfer Agreement*," effective as of July 5, 1995 (the "*Nunc Pro Tunc Assignment*"). Through the *Nunc Pro Tunc* Assignment, the Trust purports to assign retroactively the "Bob Ross Intellectual Property" (as defined in the First Amendment) to Jimmie Cox and Steve Ross "as individuals," with Jimmie Cox receiving a fifty-one percent (51%) interest and Steve Ross a forty-nine percent (49%) interest therein. Barger Dec. Ex. Y.

28.    At no time prior to the March 9, 2017 did RSR Art, LLC or any of its shareholders or employees, or anyone acting on its behalf, assert any claim to rights in any intellectual property created by or related to Bob Ross or to revenues generated through sales of products licensed by BRI that bore Bob Ross's name or likeness. J. Kowalski Dec., ¶ 23.

29.    From 2001 through 2016, Lawrence Kapp, a founder and officer of RSR Art, LLC

(and also its Rule 30(b)(6) witness in this action), worked in sales and purchasing for MFW, the licensed manufacturer of art and painting supplies bearing the name and likeness of Bob Ross. During the years he worked for MFW, Mr. Kapp placed purchase orders for tens of thousands of units of Bob Ross licensed products from BRI.  Mr. Kapp also was directly involved in developing and designing a paint-by-numbers set and its packaging, which displayed Bob Ross's name and likeness and was licensed by BRI.  Further, Mr. Kapp sold Bob Ross licensed product to retailers, which included the largest art supply stores in the Mid-Atlantic region of the United States.  Mr. Kapp always was aware that MFW was authorized to manufacture and sell products and packaging bearing Bob Ross's name and likeness pursuant to a license from BRI.  Kapp Dep. at 26:14-27:22, 28:6-16, 29:20-30:18, 31:17-32:2, 34:14-35:12, 37:14-17, 38:15-39:2, 42:7-43:7, 44:16-45:10, 46:20-49:2, 49:20-53:14, 56:18-57:4, 57:12-58:17, 59:3-10, 60:15-61:3, 62:12-19, 63:9-13, 63:19-22, 64:8-15, 65:18-66:3, 66:19-68:9, 69:6-71:22, 73:13-75:16.  (Barger Dec. Ex. Q)

30.    Bob Ross's son, Steve Ross, a founder and owner of RSR Art, LLC, actively participated in BRI's activities to promote Bob Ross, both prior to and after Bob Ross's death. Steve Ross was a "Bob Ross soldier" who "did [his] best to promote dad."  For example, Steve Ross was paid by BRI to teach classes on the Bob Ross painting technique, and taught approximately 50 such classes over a period of 12 to 14 years.  He saw at these classes that attendees received various merchandise bearing Bob Ross's name and likeness.  Those items included Bob Ross pens, notebooks, keychains, T-shirts, canvas bags, watches, and jigsaw puzzles.  Steve Ross also has been aware that BRI, beginning during Bob Ross's lifetime and continuing through to the present, has owned and operated the Bob Ross Gallery in his hometown of New Smyrna Beach, Florida.  Steve Ross also has been aware and has seen first-

hand that BRI, both prior to and after Bob Ross's death, has sold at the Bob Ross Gallery art and painting supplies and other products bearing the name and likeness of Bob Ross and that those products are licensed by BRI.  Ross Dep. at 26:21-27:16, 28:1-12, 30:1-32:7, 32:8-13, 33:7-35:14, 36:21-37:2, 51:16-53:16, 109:10-22.  (Barger Dec. Ex. R)

31.     After his father's death, Steve Ross always was suspicious that others in his family were hiding something from him regarding his father's Estate and the Trust that his father established for his benefit.  However, Steve Ross never took steps to review the documentation regarding his father's Estate or the Trust despite having every opportunity to do so and the fact that all such documentation was kept at the home of his uncle, Jimmie Cox, who has resided in the same town, namely, New Smyrna Beach, Florida.  Ross Dep. at 83:4-13, 85:15-86:11, 92:14-95:6, 110:11-116:7, 117:18-119:14.  (Barger Dec. Ex. R).

32.     If Plaintiff is granted the relief it seeks and BRI is required to cease all sales of Bob Ross merchandise, it would put BRI in breach of its contracts with its primary licensing agents, including Firefly Brand Management and Twitch Interactive.  J. Kowalski Dec., ¶ 24.

## ARGUMENT

### A.  THE SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the moving party demonstrates that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law."  *U-Haul Int'l, Inc. v. WhenU.com*, 279 F. Supp 2d 723, 726 (E.D. Va. 2003).  As one court in this Circuit has recognized, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 726 -27 (citations omitted, emphasis in original).  As the Supreme Court explained, a fact is "'material' only if it might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

The purpose of summary judgment is "to avoid a useless trial.  It is a device used to make possible the prompt disposition of controversies on their merits without a trial, if in essence, there is no real dispute as to the salient facts."  *Johnson v. McKee Banking*, 398 F.Supp. 201, 204 (W.D. Va. 1975), *aff'd*, 532 F.2d 750 (4th Cir. 1976).  Here, as there are no ***material*** facts in dispute, summary judgment is appropriate.

### B.  SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF BRI AS PLAINTIFF DOES NOT OWN THE RIGHTS IT SEEKS TO ENFORCE AND THUS HAS NO STANDING TO BRING THIS ACTION

A challenge to plaintiff's standing is treated as an issue of subject matter jurisdiction and may be raised at any stage of the proceedings. *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230-231 (4th Cir. 2008) (affirming dismissal and recognizing that "standing implicates [the court's] subject matter jurisdiction"); *Equal Access Educ. v. Merten*, 325 F.Supp. 2d 655, 660-61 (E.D. Va. 2004) (granting dismissal and noting that "standing is a subject matter jurisdiction issue that can be revisited at any time"); *see* Fed. R. Civ. P. 12(b)(1), 12(h) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action.").

Once a defendant challenges the plaintiff's standing, the "[p]laintiff bears the burden of establishing that the Court has subject matter jurisdiction."  *A.W. v. Fairfax County Sch. Bd.*, 548 F. Supp. 2d 219, 221 (E.D. Va. 2008); *see also Porter v. United States*, 919 F. Supp. 927, 929 (E.D. Va. 1996) (recognizing that once "subject matter jurisdiction is challenged, the burden of establishing its existence always rests upon the party asserting jurisdiction").

14

Where a party does not own legally, cognizable, exclusive property interests in a trademark or other intellectual property, the party has no standing to sue. *See Visa U.S.A. Inc. v. First Data Corp.*, No. C 02-01786 JSW, 2006 U.S. Dist. LEXIS 18482, *27 (N.D. Cal. Aug. 16, 2005) (plaintiff "could not have suffered a cognizable injury under Article III because it did not maintain an enforceable right in the trademark it sought to protect").

Accordingly, RSR Art bears the burden of establishing its standing to bring this action.  It cannot meet that burden for two reasons:  (1) there is a break in the chain of title of the rights claimed by RSR Art, and its attempt to remedy that defect – 22 years after the fact and for the purpose of enhancing its litigation posture – is unavailing; and (2) the documents and agreements executed before and after Bob Ross's death irrefutably establish BRI's ownership of the intellectual property rights at issue.

> ## 1. The *Nunc Pro Tunc* Assignment Failed to Remedy the Gap in the Chain of Title to the Bob Ross Intellectual Property such that Steve Ross had No Rights to Convey to RSR Art.

Plaintiff's claims at Counts I through III of its Complaint are based entirely on rights it allegedly obtained through an assignment from Steve Ross in February 2017.  Plaintiff, therefore, must show that Steve Ross owned the rights upon which Plaintiff now relies to bring and maintain this lawsuit.  The execution of the *Nunc Pro Tunc* Assignment on May 26, 2017 demonstrates that Steve Ross did not own the rights to the intellectual property at issue when he purportedly assigned the intellectual property to Plaintiff in February 2017.

The law on this point is clear.  A party cannot maintain a lawsuit based on an assignment of rights if the assignor, *i.e,*, Steve Ross, lacked those rights at the time it executed the assignment of rights. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1367 (Fed. Cir. 2010) (holding that an agreement attempting to sell, transfer, assign, and set over all rights, title, and interest in the patents was ineffective when the assignor does not own the patents); *RAD*

*Data Commc'ns, Inc. v. Patton Elecs. Co.*, 882 F. Supp. 351, 353 (S.D.N.Y. 1995) (holding the assignment was a nullity: "Since Develcon had nothing to assign, the purported assignment from Develcon to plaintiff of the Develcon patents is a nullity.") (citing *FilmTec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991))). Moreover, the assignee, *i.e.*, Plaintiff, cannot cure this defect solely by the creation of a subsequent *nunc pro tunc* assignment between the original assignor and the assignee upon whose rights Plaintiff relies. In short, the *Nunc Pro Tunc* Assignment did not retroactively cure the defects of the assignment between Steve Ross and Plaintiff.

Recently, the U.S. District Court for the District of Maryland addressed facts similar to those here. *In re CTP Innovations, LLC,* 2016 WL 6996738 (D. Md. Nov. 29, 2016). In *CTP Innovations*, a patent owner tried to provide the plaintiff with patent rights by securing a *nunc pro tunc* assignment of rights before the complaint was filed. *Id*. at *3. However, the patent owner did not revise its prior assignment to the plaintiff/assignee. *Id*. at *6. The court relied on the legal principle *nemo dat quod non habet*, or that one can only convey rights one has. *Id*. at *4. The court noted that these types of agreements cannot be used to "rewrite history" and are not sufficient to "confer retroactive standing." *Id*. at *5.

The *CTP Innovations* court cited, *inter alia*, *Abraxis*, 625 F.3d 1359 in support of its decision. In *Abraxis*, the court described the effort to rely on a subsequent *nunc pro tunc* assignment as involving a "break in the chain of title". *Id.* at *6. The *CTP Innovations* court also cited *Abraxis* as support for the legal conclusion that the existence of a *nunc pro tunc* assignment could be viewed as "clear recognition" and evidence of a critical error in the previous assignment and therefore as evidence that the previously executed assignment was neither valid nor effective to transfer rights sufficient to support standing. *Id.*

16

Indeed, the Federal Circuit's approach in *Abraxis* to this issue is unsurprising because *nunc pro tunc* provisions only correct mistakes; they do not operate to record events intended to be made but which, in fact, never occurred. *Glynne v. Wilmed Heathcare*, 699 F.3d 380, 383-84 (4th Cir. 2012) ("The purpose of an order entered *nunc pro tunc* is to correct mistakes or omissions in the record so that the record properly reflects the events that actually took place. ***It may not be used to retroactively record an event that never occurred or have the record reflect a fact that never existed.***") (emphasis added).

Other courts have also treated *nunc pro tunc* agreements with suspicion especially when they are "clearly created for the purpose of sustaining plaintiff's position in … litigation." *Wallace Intern. Silversmith's, Inc. v. Stanley Roberts, Inc.*, No. 87 CIV. 3574 (WK), 1990 WL 123793, at *2 (S.D.N.Y. Aug. 8, 1990); *Lingo Corp. v. Topix, Inc.*, No. 01 Civ. 2863(RMB), 2003 WL 223454, at *4 n.3 (S.D.NY. Jan. 31, 2003) (*Nunc pro tunc* agreement used to further a plaintiff's position should be disfavored).

Here, the break in the chain of title occurred in May 1995.  The First Amendment, dated May 25, 1995, states that Bob Ross, as Trustee of the Trust, "***shall assign*** to [his] brother, JIMMIE L. COX, of New Smyrna Beach, Florida, a fifty-one percent (51%) interest in all rights and interests in intellectual property, and ***shall assign*** to [his] son, ROBERT STEPHEN ROSS, of Ronkonkoma, New York, a forty-nine percent (49%) interest [in] said rights and interests in intellectual property . . . ."  SUF, ¶ 24 (emphasis added).  A necessary precondition of such an assignment by the Trust was for Bob Ross, in his individual capacity, to convey such "rights and interests in intellectual property" to the Trust before the Trust could convey such rights and interests to Cox and Steve Ross.  Bob Ross, in his individual capacity, executed such an assignment to the Trust that same day, May 25, 1995.  SUF, ¶ 25.

It is undisputed, however, that Bob Ross, as Trustee of the Trust, **never** caused **the Trust** to assign **any** "rights and interests in intellectual property" to either Cox or Steve Ross. Despite this clear gap in the chain of title, RSR Art, in the March 9, 2017 letter, nonetheless asserted that it owned all rights and interests in the Bob Ross-related intellectual property. It was not until nearly three months later, on May 26, 2017, that RSR Art attempted to cure the defect in title through the *Nunc Pro Tunc* Assignment. Regardless, the fact remains that Steve Ross **had no rights or interest in the Bob Ross-related intellectual property at the time he executed the purported assignment to RSR Art on February 10, 2017.** Indeed, the very existence of the *Nunc Pro Tunc* Assignment is proof positive that Steve Ross had no such rights to convey.

RSR Art's lack of standing cannot be remedied by a *nunc pro tunc* assignment between Steve Ross and RSR Art. *See Enzo Apa & Sons, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093-94 (Fed. Cir. 1998) ("nunc pro tunc assignments are not sufficient to confer retroactive standing on the basis that  . . . [it] would unjustifiably expand the number of people who are statutorily authorized to sue"); *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.3d 1574, 1578-79 (Fed. Cir. 1991) ("we can not accept Arachnid's 'Back-To-the-Future' theory" because plaintiff must have standing as comprehended by the patent statute in order to exercise the right to bring an action for infringement); *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 777-79 (Fed. Cir. 1996) (reversing district court's denial of a motion to dismiss for lack of standing because assignment of trademark rights was "not sufficient to confer standing . . . retroactively."). RSR Art's contrived *Nunc Pro Tunc* Assignment should thus be viewed for precisely what it is – an attempt to rewrite history some 22 years after the fact to create standing where none exists.

> ### 2. The Agreements Executed Before and After Bob Ross's Death Conclusively Establish BRI's Ownership of the Bob Ross-related Intellectual Property.

Plaintiff's claim to rights in the Bob Ross-related intellectual property rests entirely upon

the definition of "intellectual property" as stated in the First Amendment.  Unless the First

Amendment defines "intellectual property" as consisting of intellectual property rights that were

owned by Bob Ross as of the date he executed the First Amendment and accompanying

assignment to the Trust on May 25, 1995, Plaintiff's claims fail.  Thus, even if there were no

break in the chain of title, Plaintiff's claims would fail for the simple reason that Bob Ross did

not own the intellectual property rights he attempted to convey to the Trust.  They were owned

by BRI.

> The First Amendment defines "intellectual property" as follows:

>> all rights, title, interests, goodwill, artist's moral rights, resale royalty
>> rights, and renewal rights, whether vested, statutory, common law,
>> contingencies, or expectancies in any and all ***intellectual property of
>> which [Bob Ross] is deemed by law to be the sole or joint author,
>> creator, artist, performer or owner***, including, but not limited to,
>> ***copyrights and trademarks regarding [Bob Ross's] name, likeness,
>> voice, and visual, written or otherwise recorded works***.  (emphasis
>> added)  (SUF, ¶ 24)

The definition of "intellectual property" thus consists of two categories:  (1) copyrights and

trademarks regarding Bob Ross's name, likeness, and voice; and (2) visual, written or otherwise

recorded works.[2]  The undisputed facts of record show that BRI, not Bob Ross, owned the

---

[2]  Plaintiff's Complaint includes at Count II a claim for "Misappropriation of Right of
Publicity," alleging that the intellectual property rights it obtained from the Trust included Bob
Ross's right of publicity.  Complaint, ¶¶ 32-36.  That contention is without merit.  Under the
principle of *expressio unius est exclusio alterius*, the omission of a particular covenant or term
from a contract reduced to writing shows an intent to exclude it.  *See Bentley Funding Group,
LLC v. SK&R Group, LLC*, 296 Va. 315, 330 (2005) (citing *First Nat'l Bank v. Roy N. Ford Co.*,
219 Va. 942, 946 (1979)) (where property conveyed under a contract did not include certain
escrows, the trial court cannot add that asset to the items conveyed and thus, unless the term
"development rights," used in the contract, included the escrows ***by definition***, courts must find
that the Contract did not transfer the escrows) (emphasis added).  Here, the term "right of
publicity" is not included in the First Amendment's definition of "intellectual property."
Plaintiff's attempt to have the Court read that term into the definition is contrary to Virginia law
and should be rejected.  Summary judgment should therefore be granted in favor of BRI as to
Count II of the Complaint, as Plaintiff has no claim to ownership of any "right of publicity" that

intellectual property as defined in the First Amendment.

First, there is no dispute that BRI has at all times owned the trademarks consisting, in whole or in part, of Bob Ross's name or likeness and that Bob Ross executed written consents authorizing BRI to register such trademarks in BRI's name with the USPTO.  SUF, ¶ 6.  Bob Ross therefore could not transfer to the Trust *any* of those trademarks as they were all owned by and registered to BRI.

The same is true for "copyrights . . . regarding [Bob Ross's] name, likeness, [and] voice" as well as "visual, written or otherwise recorded works."  Both the Contract and Letter Agreement between BRI and WIPB-TV for development and production of "The Joy of Painting" television series expressly state that "all ownership rights, including but not limited to all series-related copyrights (including the programs, series, books and art), master tapes, scripts, transcripts, and on-air produced paintings, are vested solely in BRI" and that such rights include "all . . . derivative, . . . and other rights of every kind and character."  SUF, ¶¶ 12-13.  The Contract and Letter Agreement further provide that "[a]ll series, programs, tapes, masters, duplicates, books, copies and other copyrightable materials developed, produced or otherwise generated in the course of performance of this Contract shall bear the notice '© Copyright [Year] by Bob Ross Inc.  All Rights Reserved.'"  SUF, ¶¶ 12-13.  Here again, Bob Ross owned none of the rights he attempted to assign to the Trust.  Those rights were owned by BRI.

And if there were any doubt (which there is not) regarding BRI's ownership of the

---

may have been owned by Bob Ross because Bob Ross did not convey any such right to the Trust.  *See Verizon Va. LLC v. XO Communs., LLC*, 144 F. Supp. 3d 850, 857 (E.D. Va. 2015) (issues of contract interpretation are matters of law germane to resolution at the summary judgment stage); *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) ("If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.").

intellectual property rights that Bob Ross attempted to assign to the Trust, it was conclusively resolved through the 1997 Agreements.  Specifically, in the 1997 Settlement Agreement, the Trust acknowledged and agreed to the following:

- ■ "BRI has sole and exclusive ownership of all rights in and to all of the creative works of Bob Ross";

- ■ "[A]ll of such creative works were prepared by [Bob Ross] as 'works made for hire' on behalf of BRI";

- ■ "BRI has all the ownership and rights in and to all copyrights in a television series and television programs known as 'The Joy of Painting' aka 'The Joy of Painting with Bob Ross' (excluding Series I thereof) and in all of the companion books and other writings and memorializations in any media related to the production, promotion or distribution thereof, including but not limited to book texts, scripts, on-air commentary, manuals, articles, instructions and explanations for all of the said series";

- ■ BRI has "ownership of all the trademarks registered to BRI and derivatives thereof"; and

- ■ "If any such rights or incidents of ownership in and/or to any of the foregoing copyrights, trademarks, publications, television series, creative works or other assets of BRI of any kind or character have somehow vested in [the Trust] or could be claimed as vesting in the [the Trust] or could be claimed as assets of [the Trust], [the Trust] hereby convey[s], transfer[s] and assign[s] all such rights and incidents of ownership and claims and ownership itself to BRI, further warranting that . . . [the Trust] has [not] done any act to encumber any part or all thereof."  SUF, ¶ 19.

Further, the 1997 Settlement Agreement states at Section 9 that "[a]ll terms and conditions of this agreement shall be binding upon the Parties [which include the Trust] and their successors in interest, including but not limited to heirs, ***assigns***, personal representatives, trustees and administrators."  Barger Dec. Ex. M (emphasis added).  As Plaintiff claims rights through a series of assignments from the Trust, Plaintiff is bound by the terms of the 1997 Settlement Agreement and is precluded from contesting BRI's ownership of the Bob Ross-related intellectual property.  *See Link Associates v. Jefferson Standard Life Ins. Co.*, 223 Va. 479, 488–89 (1982) (quoting *United States v. Idlewild Pharmacy, Inc.*, 308 F. Supp. 19, 23 (E.D.

Va. 1969)) ("[A] party cannot accept the benefits of a contract and then seek to be relieved of its obligations")).

## C. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF BRI ON COUNTS I AND II OF THE COMPLAINT AS PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Since the early 1980's, BRI has actively promoted Bob Ross and his painting, and has licensed his name and likeness across dozens of product categories, all with the knowledge and consent of Bob Ross. SUF, ¶¶ 3-15, 22. Now, decades later, Plaintiff brings this lawsuit claiming that it, and not BRI, owns the intellectual property rights relating to Bob Ross despite the knowledge of and active participation by Plaintiff's own founders and principals in BRI's promotional activities. Simply stated, Plaintiff is decades late in asserting its claims.

### 1. Plaintiff's Right of Publicity Claim at Count II of the Complaint Is Barred by the Statute of Limitations

Virginia follows the general conflicts of law rule that the statute of limitations of the forum state (*i.e.*, Virginia) governs litigation in its courts. *Hospelhorn v. Corbin*, 179 Va. 348, 350 (1942); 1-4 VIRGINIA CIVIL PROCEDURE § 4.14. Virginia's right of action for a violation of the right of publicity, Va. Code Ann. § 8.01-40(A), creates an individual property right in the individual's name and likeness. *Lavery v. Automation Mgmt. Consultants, Inc.*, 234 Va. 145, 154 (1987). Consequently, the five-year limitation period of Va. Code Ann. § 8.01-243(E), the relevant statute of limitations for injury to property, applies. *Id.*

The general principle, well recognized in Virginia law, is a cause of action for "injury to property" accrues when the first measurable damage occurs. *Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 123–24 (2017); *see also* Va. Code Ann. § 8.01-230 (providing that "the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of . . . damage to property"). Under

Virginia law, the statute of limitations does not accrue separately for each set of damages resulting from a wrongful act.  Once a cause of action is complete and the statute of limitations begins to run, it runs against all damages resulting from the wrongful act, even damages which may not arise until a future date.  *See Street v. Consumers Mining Corp.*, 185 Va. 561, 39 S.E.2d 271 (1946); *Louisville & N.R. Co. v. Saltzer*, 151 Va. 165, 144 S.E. 456 (1928).

The Virginia Supreme Court has not expressly elaborated on when the cause of action violation of the right of publicity under § 8.01-40(A) accrues, but the court in *Lavery*, *supra*, provides guidance.  In *Lavery*, the court provided an example of the inapplicability of 8.01-40(B) in acting as a statute of limitation.  234 Va. at 147.  The Court stated:

> For example, *if the picture of a newborn baby were used for advertising or trade purposes without the permission of the baby's parents*, and if that child lived to be 90 years old, by Lavery's analysis a suit would be timely if brought within 20 years of the person's death. This would be 110 years after the wrongful conduct.

*Id*. (emphasis added).  Other courts have similarly recognized that the injury accrues when an individual's name, image, or likeness is used through some form of publication of the image for trade purposes.  *See Blair v. Nevada Landing Partnership*, 859 N.E.2d 1188 (Ill. App. Ct. 2d Dist. 2006) ("the first time that an offending item is published, the . . . statute of limitations begins to run and the dissemination of that same offending item thereafter does not give rise to a new cause of action, nor does it refresh the running of the statute of limitations").

Here, Plaintiff's right of publicity claim was filed well beyond the expiration of the five-year limitation period of Va. Code Ann. § 8.01-243(E).  As early as 1986, and prior to Bob Ross's death on July 4, 1995, BRI licensed Bob Ross's name and likeness for use on a range of different products for sale to consumers to promote Bob Ross and his painting.  BRI's licensing activities included the use of Bob Ross's name and likeness on art and painting supplies, "The

23

Joy of Painting" companion books and DVD sets, apparel items, porcelain plates, paint-by-number sets, puzzles, T-shirts, ballpoint pens, bumper stickers, coffee mugs, letter openers, aprons, holiday cards, post cards, pins, lunch sacks, visors, tote bags, wrist watches, refrigerator magnets, keychains, and lab coats.  SUF, ¶¶ 3-15, 22.  Plaintiff, whose principals actively participated in BRI's promotional activities (SUF, ¶¶ 29-30), failed to bring this suit until September 25, 2017.  As a result, any claim for misappropriation of Bob Ross's right of publicity has long since expired.

Plaintiff' misguidedly alleges in Count II of the Complaint that it is entitled to protection until 2035 because of Florida laws' protection of the right of publicity extending 40-years after death.  The Virginia legislature intended § 8.01-40(B)—which provides no suit can be brought 20 years after a person's death (in Florida, it is 40 years)—to be a cutoff statute, and, as such, to operate as an outside time period in which true statutes of limitations would operate and beyond which no suit based on § 8.01-40(A) could be maintained.  *Id*. at 149.  The General Assembly in enacting § 8.01-40(B) was not setting a period within which suit must be brought.  Instead, it was providing a cutoff point after which suit could not be brought.  *Id*.[3]

---

[3]  If Plaintiff tries to argue that the Court should apply Florida law involving the 40-year cutoff point, this Court should find that the law is the same under Florida in that the 40-year cutoff is not intended to be a statute of limitations, despite the fact Florida has a 40-year cutoff as opposed to a 20-year cutoff.  Instead, a *four-year* statute of limitations applies to Florida's right to publicity statute, Fla. Stat. § 540.08.  Under Florida law, because Fla. Stat. § 540.08 does not provide its own statute of limitations and does not fall within any of the specific categories provided in Fla. Stat. § 95.11 (entitled "Limitations other than for the recovery of real property"), the four-year catch-all statute of limitations applies.  *See* Fla. Stat. § 95.11(3)(p) (providing four-year statute of limitations for "[a]ny action not specifically provided for in these statutes.").  This four-year period begins to run at the date of publication (not at discovery of publication).  *See Putnam Berkley Group, Inc. v. Dinin*, 734 So.2d 532, 536 (Fla. 4th DCA 1999) (holding that actions under Fla. Stat. § 540.08 must be brought within four years of the accrual of the cause of action, not four years of discovery of the fact of publication).  Thus, regardless of whether the Virginia or Florida statute of limitations applies, Plaintiff's right of publicity claim was brought long after the expiration of the applicable statute of limitations.

**2.   Plaintiff's Claim at Count I of the Complaint for False Representation Under Section 43(a) of the Lanham Act is Barred by the Statute of Limitations**

As this Circuit and others have long held, "it is proper to use the analogous statute of limitations period for Lanham Act suits because the Act provides no express statute of limitations." *PBM Products, LLC v. Mead Johnson & Co.*, 639 F. 3d 111, 121 (4th Cir. 2011) (affirming district court's conclusion that the analogous state limitations period barred plaintiffs' false advertising claim under the Lanham Act).   In Virginia, the analogous state limitations period is two years.  *Id*. (*citing* Va. Code § 8.01-243(A)).  *See also Reynolds Consumer Prods., Inc. v. Handi-Foil Corp.*, 2014 WL 3615853 at *11 (E.D. Va. July 18, 2014) (O'Grady, J.) (holding same).

Here, Plaintiff's false representation claim under the Lanham Act was filed well after the expiration of the applicable two-year statute of limitations.  As shown in Section C.1., *supra*, the events allegedly giving rise to this claim occurred more than ***two decades ago***.  Summary judgment should therefore be granted in favor of BRI on Count II of the Complaint.

**D.   SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF BRI AS PLAINTIFF'S CLAIMS ARE BARRED BY THE DOCTRINE OF LACHES**

Plaintiff's unreasonable and extreme delay in bringing this action warrants the application of the doctrine of laches.  Laches is "the neglect or failure to assert a known right or claim for an unexplained period of time under circumstances prejudicial to the adverse party." *Stewart v. Lady*, 251 Va. 106, 114 (1996) (quoting *Princess Anne Hills v. Susan Constant Real Est.*, 243 Va. 53, 58 (1992); *see also Wolf v. Citizens Bank & trust Co.*, 92 F.2d 233, 237 (4th Cir. 1937) (holding plaintiff was guilty of laches in waiting to see how a venture would fare financially and therefore, would not be heard to assert his rights after this unexplained delay).[4]

---

[4]   It should not go unnoticed that Plaintiff's decision to bring this action at this late date was

Here, laches bars each of the claims in Plaintiff's Complaint.

First, with regard to Plaintiff's Lanham Act claim in Count I, estoppel by laches generally applies "to preclude relief for a plaintiff who has unreasonably 'slept' on his rights." *Brittingham v. Jenkins*, 914 F.2d 447, 456 (4th Cir. 1990).  In other words, laches bars a claim under the Lanham Act where a defendant is prejudiced by a plaintiff's unreasonable delay in bringing suit after the plaintiff knew of the defendant's violation.  *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Texas*, 357 F.3d 441, 449 (4th Cir. 2004) ("Because the Lanham Act does not include a limitations period, courts use the doctrine of laches to address the inequities created by a trademark owner who, despite having a colorable infringement claim, allows a competitor to develop its products around the mark and expand its business, only then to lower the litigation boom.").

When a Lanham Act plaintiff files suit outside of the statute of limitations, both elements of laches – unreasonable delay and prejudice – are strongly presumed.  *PBM Products*, 639 F. 3d at 121 (*citing EEOC v. The Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 80 (3d Cir. 1984) (finding that once the statute of limitations has expired, the defendant "enjoys the benefit of a presumption of inexcusable delay and prejudice").  *See also* J. Thomas McCarthy, 5 McCarthy On Trademarks and Unfair Competition § 31:12 ("[l]aches is a good defense if plaintiff's long failure to exercise its legal rights has caused defendant to rely to its detriment by building up a valuable business around its trademark.").

Here, Plaintiff's failure to file suit within the analogous two-year limitations period applicable to its Lanham Act claim (*see* Section C.2., *supra*) creates the strong presumptions that

---

motivated, as its Complaint suggests, by the "renewed popular interest" in Bob Ross "due in part to the rebroadcast of his educational television programs via Netflix and Twitch,"  Complaint, ¶ 18, for which BRI was solely responsible.  SUF, ¶ 22.  The present lawsuit is Plaintiff's attempt to "cash-in" on BRI's efforts.

its delay was unreasonable and that BRI has been prejudiced by the delay.  Beyond that fact, Plaintiff's founders and principals have been aware for more than two decades of BRI's activities to promote Bob Ross and his painting.

For instance, Bob Ross's son, Steve Ross, who also is a founder and principal of Plaintiff, actively participated in BRI's activities to promote Bob Ross both before and after his father's death.  During his deposition, Steve Ross testified that he "was a Bob Ross soldier" and that "[w]e all did our best to promote dad."  SUF, ¶ 30.  For example, Steve Ross was paid by BRI to teach classes on the Bob Ross painting technique, and taught approximately 50 such classes over a period of 12 to 14 years.  SUF, ¶ 30.  As an instructor for those classes, Steve Ross was aware and saw first-hand that BRI used Bob Ross's name and likeness on a variety of items that were provided to individuals who took the classes.  Those items included Bob Ross pens, notebooks, keychains, T-shirts, canvas bags, watches, and jigsaw puzzles.  SUF, ¶ 30.  Steve Ross also has been aware that BRI, beginning during Bob Ross's lifetime and continuing through to the present, has owned and operated the Bob Ross Gallery in his hometown of New Smyrna Beach, Florida.  SUF, ¶ 30.  Steve Ross also has been aware and has seen first-hand that BRI, both prior to and after Bob Ross's death, has sold at the Bob Ross Gallery art and painting supplies and other products bearing the name and likeness of Bob Ross and that those products are licensed by BRI.  SUF, ¶ 30.[5]

In addition, Plaintiff's Rule 30(b)(6) witness, Lawrence Kapp, worked for sixteen years for Martin F. Weber Co., BRI's licensed manufacturer of art and painting supplies, where he was

---

[5]  After his father's death, Steve Ross always was suspicious that others in his family were hiding something from him regarding his father's Estate and the Trust.  However, Steve Ross never took steps to review the documentation regarding his father's Estate or the Trust despite having every opportunity to do so and the fact that all such documentation was kept at the home of his uncle, Jimmie Cox, who has many years resided in the same town, namely, New Smyrna Beach, Florida.  SUF, ¶ 31.

directly involved in purchasing from BRI substantial quantities of products bearing Bob Ross's name and likeness and selling those products to major art supply retailers throughout the Mid-Atlantic region of the United States.  SUF, ¶ 29.  Mr. Kapp also was directly involved in developing a Bob Ross paint-by-number set and had input into the product and package design, which bore Bob Ross's name and likeness and was licensed by BRI.  SUF, ¶ 29.

Further, BRI has been prejudiced by Plaintiff's lengthy delay in filing suit.  For more than two decades, BRI has openly been offering and selling to the public a wide variety art and painting supplies and other merchandise that bears the Bob Ross name and likeness, including through its website at www.bobross.com.  SUF, ¶ 22.  Also for more than two decades, BRI has received and filled telephone orders for such products placed by consumers through its toll-free number, 1-800-BOB-ROSS (1-800-262-7677).  SUF, ¶ 22.  Further, BRI has for many years, and at a considerable expenditure of time, money, and resources, vigilantly policed its rights in the Bob Ross-related intellectual property by aggressively pursuing third parties who violated those rights.  SUF, ¶ 22.  BRI also negotiated the arrangements to stream episodes of "The Joy of Painting" on Netflix and Twitch, resulting in renewed interest in and increased popularity of Bob Ross.  SUF, ¶ 22.

And from the outset of its business to the present, BRI has licensed numerous third parties to manufacture and sell products bearing Bob Ross's name and likeness, including a deal in 2016 with Firefly Brand Management to build further on the popularity and goodwill of the Bob Ross brand.  SUF, ¶ 22.  If Plaintiff is granted the relief it seeks and BRI is required to cease all sales of Bob Ross merchandise, it would put BRI in breach of its contracts with its primary licensing agents, including Firefly Brand Management and Twitch Interactive.  SUF, ¶ 32.

These undisputed facts leave no doubt that Plaintiff's Lanham Act claim is barred by

laches.  *See PBM Products*, 639 F.3d at 121-22 (affirming district court's finding of laches based on plaintiff's unreasonable delay and prejudice to defendant; "Indeed, by alleging that PBM has been unjustly enriched by over $27 million as a result of the 'compare to' ads, [plaintiff] must concede that permitting this suit to go forward would enable it to benefit from its own unreasonable delay.").

For these same reasons, laches also bars Plaintiff's right of publicity claim (Count II). The case of *Miller v. Glenn Miller Productions*, 318 F Supp. 2d 923 (C.D. Cal. 2004), *aff'd* 454 F.3d 975 (9th Cir. 2006) is instructive.  In *Miller*, the adopted sons of the famed big band leader and musician Glenn Miller brought suit for, among other things, violation of the statutory right of publicity against Glenn Miller Productions ("GMP"), the company established after Glenn Miller's death that licensed his name and likeness for use by other "big band" orchestras and for a variety of merchandise.  GMP moved for summary judgment on the grounds of laches.

In granting the motion, the district court applied a "constructive notice" standard to determine the reasonableness of the plaintiffs' delay in filing suit, and measured the delay from the time the plaintiffs (the adopted sons) "knew or should have known about his potential cause of action."  *Miller*, 318 F. Supp. 2d at 941.  The court found the plaintiffs' delay unreasonable based on (1) their involvement in GMP matters since 1979, (2) the attendance by one of the sons at six Glenn Miller Orchestra concerts since the early 1990s at which merchandise was advertised and sold in prominent locations, and (3) "GMP's open and notorious sale of merchandise on its website."  *Id*. at 944.  The court also found that GMP was prejudiced by the plaintiffs' delay as GMP has "invested a significant amount of time and money in developing its merchandising program, cultivating a market for GMP music, expanding its business through the operation of special Glenn Miller Orchestra units, and forming relationships with sub-licensees

29

throughout the world."  *Id*.  The court also found that "if GMP is forced to stop sub-licensing, it will be in breach of its existing sub-licensing agreements, and may thus incur liability for damages."  *Id*.  On appeal, the Ninth Circuit affirmed, holding that the district court correctly concluded that the plaintiff sons "had constructive knowledge of GMP's activities as early as 1981, more than twenty years before the current suit was filed."  454 F.3d at 981.

Finally, laches also bars Plaintiff's claim at Count III for cancellation of BRI's federal trademark registrations that consist of the name and/or likeness of Bob Ross.  Under the Lanham Act, "[r]egistration of a mark on the principal register . . . ***shall be constructive notice of the registrant's claim of ownership thereof***."  15 U.S.C. § 1072 (emphasis added).  Plaintiff here seeks cancellation of trademark registrations owned by BRI dating back to as early as 1986.  Complaint, ¶ 39.  As a matter of law, Plaintiff's founders and principals have had constructive notice of the first of BRI's trademark registrations for over three decades, and continued to have such notice with each successive registration over the ensuing two decades.  Plaintiff's belated attempt to cancel those registrations through this lawsuit is therefore barred by laches.  *See Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Ouest De La France*, 245 F.3d 1359, 1362, 1364 (Fed. Cir. 2001) (holding that a petition for cancellation of a registered trademark was barred by the doctrine of laches based on the petitioner's constructive knowledge).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Bob Ross, Inc. respectfully requests that the Court grant summary judgment in favor of Defendant as to Counts I through III of Plaintiff's Complaint.

Dated:   July 20, 2018                  Respectfully submitted,


                                        /s/ David G. Barger
                                        David G. Barger (VSB # 21652)
                                        *Counsel for Defendant Bob Ross, Inc.*
                                        GREENBERG TRAURIG, LLP
                                        1750 Tysons Blvd., Suite 1000
                                        McLean, VA 22102
                                        Telephone: (703) 749-1307
                                        Facsimile: (703) 714-8307
                                        Email: bargerd@gtlaw.com

                                        Steven J. Wadyka, Jr. (*Admitted pro hac vice*)
                                        *Counsel for Defendant Bob Ross, Inc.*
                                        GREENBERG TRAURIG, LLP
                                        2101 L Street, N.W., Suite 1000
                                        Washington, D.C.  20037
                                        Telephone: (202) 331-3105
                                        Facsimile: (202) 331-3101
                                        Email: wadykas@gtlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFIY that on the 20th day of July, 2018, I will electronically file

the foregoing with the Clerk of the Court using the CM/ECF system which will then send a

notification of such filing (NEF) to the following.

> Iris Figueroa Rosario, (Va. Bar No. 47350)
> GRAY, PLANT, MOOTY, MOOTY
> & BENNETT, P.A.
> Attorney for Plaintiff
> The Watergate – Suite 700
> 600 New Hampshire Ave. NW
> Washington, DC 20037
> Telephone: (202) 295-2204
> Fax: (202) 295-2250
> iris.rosario@gpmlaw.com
>
> PARTRIDGE PARTNERS PC
> Mark V.B. Partridge (pro hac vice)
> Daniel L. Rogna (pro hac vice)
> 321 North Clark Street, Ste. 720
> Chicago, IL 60654
> Telephone: (312) 634-9502
> mark@partridgepartnerspc.com
> daniel@partridgepartnerspc.com
>
> Attorneys for Plaintiff

> /s/ David G. Barger
> David G. Barger (VSB # 21652)
> *Counsel for Defendant Bob Ross, Inc.*
> GREENBERG TRAURIG, LLP
> 1750 Tysons Blvd., Suite 1000
> McLean, VA 22102
> Telephone: (703) 749-1307
> Facsimile: (703) 714-8307
> Email: bargerd@gtlaw.com