UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

RSR ART, LLC,                          )
                                       )
                                       )
    Plaintiff,                         )
                                       )        Civil No. 1:17-cv-01077-LO-TCB
                                       )
            v.                         )
                                       )
BOB ROSS, INC.,                        )
                                       )
    Defendant.                         )

## DECLARATION OF WALTER KOWALSKI

I, Walter Kowalski, declare and state as follows:

1. I am 89 years of age and competent to provide this declaration.

2. The following statements are based on my personal knowledge unless otherwise stated.

3. I am married to Annette Kowalski. We married in 1954.

4. We had five children.  John, the oldest, died in 1981 as a result of an automobile accident.  After his death, Annette, who is a painter, decided she wished to take some painting classes. She learned that Bob Ross taught painting classes in Florida.  In 1981, she and I traveled to Florida where she took a week-long course with Bob Ross.

5. We struck up a friendship with Bob and discussed the opportunity for going into business together and agreed to go into business together.

6. In or about 1982 I began coordinating painting demonstrations that Bob would give in shopping malls. Annette and I personally helped fund and pay Bob.

7. In or about 1983 we developed the first TV series and companion book, funded in part with funds from a second mortgage on our house.

*WDC 373695098v1*

8. In or about 1984, Jane, and Bob and Jane's son, Steve, came to live with us in our Virginia home. We continued to pay Bob with some of our personal funds.

9. Bob Ross, Inc. (BRI) was incorporated in Virginia on December 6, 1984 by Bob Ross, his wife Jane Ross, Walter Kowalski, and Annette Kowalski. The purpose of BRI as stated in its Articles of Incorporation was "to engage in the business of promoting artistic activities for commercial purposes and, additionally, to conduct business of any character whatsoever that is not prohibited by law or required to be stated in the Articles of Incorporation." In reality, the entire purpose of BRI was to promote the artist Bob Ross through any and all commercial means and media available. That is why we chose the company name, Bob Ross. Indeed, our 800 number was and is 1-800-Bob Ross (262-7677).

10. The ownership of BRI was equally divided among the incorporators, such that Bob Ross, Jane Ross, Walter Kowalski, and Annette Kowalski each owned twenty-five percent (25%) of the corporation.

11. In addition to being a part owner, Bob Ross was also an employee of BRI and served as its President. He was listed in BRI's employee payroll records as an employee and received a regular salary plus benefits. Bob Ross also received a Form W-2 on an annual basis from 1986 through 1995.

12. I also was an employee of BRI and held the title of CEO while Bob was alive, and then took the title President. I was primarily responsible for the administrative and day to day aspects of operating the company.

13. I gave up my title in 2012 and my daughter, Joan Kowalski, who has worked in the business since 1988, took over the position as President.

2

14. From the period of 1986 to 1992, BRI applied for and obtained five (5) U.S. trademark registrations consisting, in whole or in part, of the name and likeness of Bob Ross. For each of the five (5) applications filed by BRI, Bob Ross executed written consents authorizing BRI to register all or part of his name and/or likeness as a trademark (or part of a trademark).

15. From the outset of its business through the present, BRI has sold or licensed consistent with its legal rights, among other things, artists' supplies, instruction books and videos relating to the artist Bob Ross.

16. During Bob Ross' lifetime, BRI also sold or licensed and promoted a wide variety of items, including but not limited to T-shirts, ballpoint pens, bumper stickers, coffee mugs, letter openers, aprons, holiday cards, post cards, pins, lunch sacks, visors, tote bags, wrist watches, refrigerator magnets, lab coats. All of these items which BRI sold or licensed or promoted during Bob Ross' lifetime, Bob Ross was aware of and encouraged. All of these items had on them, either Bob Ross' name or likeness, or both. In many instances, Bob Ross himself came up with the idea to promote or merchandise the item.

17. As an example of Bob's involvement in and awareness of the broad nature of the BRI business, see BRI documents BRI0000341-345, attached as Exhibit 1. These documents consist of a four page typed memo from Bob Ross and a handwritten note from Bob to me dated September 15, 1993 discussing his ideas in the memo for a painting stage show in Branson, Missouri. Under the category of "MERCHANDISING," Bob discussed "items to offer," including "…videos, relaxation therapy tapes featuring Bob's voice, Tee-shirts, baseball caps, vest, aprons,

3

easels, soap-on-a-rope – a full range of tourist items." Bob also discussed offering items geared toward children, including, "coloring books, puppets, clothes, bedspreads, towels, toothbrushes and on and on---."

18. Bob also recognized and admitted in that memo that "[t]he greatest asset we [the company] own is the Bob Ross name and image."

19. During the early 1990s, Bob was active in exploring and promoting BRI to sell and license a line of collectible plates with Bob's image on them. Bob was also involved in and instrumental in exploring Bob Ross gifts and collectibles, such as fragrance bottles, figurines, paperweights, wood boxes with soap, tiles, and even a raccoon that would be referenced as the Bob Ross Collection.

20. On August 4, 1989, BRI entered into License Agreement with an art supply manufacturer, Martin F. Weber Co. ("MFW"), whereby BRI granted to MFW a license to manufacture and sell art products "*bearing the name 'Bob Ross', likeness and biographic material of Robert N. Ross, who has assigned all the same to BRI*, and to the trademark and logo for 'Bob Ross' as owned by BRI." (emphasis added) The License Agreement further states that "*All other rights not specifically licensed to MFW hereunder are fully reserved to and retained by BRI, and BRI is and shall be the owner of all package design incorporating the name 'Bob Ross', likeness, biographic material, trademark or logo.*" (emphasis added) Bob Ross was aware of and consented to these uses of his name and likeness.

21. Beginning in the 1980s and continuing into the 1990s, BRI developed a television series titled "The Joy of Painting" featuring Bob Ross. The series consisted of Bob Ross demonstrating his painting techniques to teach viewers how to "paint like Bob."

4

The series was broadcast via the Public Broadcasting Service ("PBS") through its Muncie, Indiana-based affiliate, WIPB-TV. There were approximately 31 series, and 403 episodes and 35 companion books for the episodes.

22. The terms of the agreement between BRI and WIPB-TV with respect to "The Joy of Painting" television series were set forth in a Contract dated July 1, 1990.

23. BRI and WIPB-TV subsequently entered into a Letter Agreement, dated December 12, 1990, regarding production and distribution of "The Joy of Painting" Series 23 and companion book. The Letter Agreement, which is on BRI letterhead, was signed by Bob Ross as President of BRI.

24. Bob Ross passed away on July 4, 1995 (Jane had previously passed away). As part of a contract entered into by the owners of BRI on December 12, 1989, entitled Cross-Purchase Agreement, and an Amendment dated July 11, 1994 (see Exhibit 2 attached), when Bob died, Annette and I, the remaining shareholders, acquired all of Bob's shares and his entire interest in BRI at the value set in the Agreements for his shares, which was 1/3 of two million dollars, $666,666.67.

I declare pursuant to 28 U.S.C. Section 1746 under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 18th day of July, 2018 at Herndon, Virginia.

_____

Walter Kowalski

*WDC 373695098v1*

# EXHIBIT 1

SEP-15-93 WED 16:17 BOB ROSS INC

P.01

9/15/93

Mr. Walt,

Updated version of Branson thoughts – Would like to hear your comments when you have time.

Contacted the Disney Artist, Jessie Clay, and he will start working on drawings –

Take care,

CONFIDENTIAL

BRI0000345

SEP 15 '93 WED 16:18  BOB ROSS INC                    P.02

CONCEPT: To have an auditorium and classroom at or near Branson, MO. Performance by Bob Ross on a daily basis. Classes running for a period of two hours, either 2 or 3 a day (some days may justify additional classes). Classes for adults and children. Children's classes taught with non-toxic products. Taught by Noobie the Clown. Adult classes taught by Dana and Steve, supplemented by CRIs as needed.

BOB'S PERFORMANCE: Must be completely choreographed. Bob's performance would consist of painting a very large panel while chatting with the audience and interacting with someone who could play a little music (guitar) and sing "cute" songs. Bob would paint with 4" paint brushes, a large knife and complete a 40"X76" panel in two hours. The music person must be able to interact with Bob. They would he o p practice this interaction until it was second nature and re se jokes, stories, reaction, etc. to turn this into an entertaining performance. This music person (might also have or o two backup players) could also be used to warm up the audie before the show start by singing "cute" songs. Background music could be worked into the painting reflecting moods such as floating clouds, running water, etc. Bob and music person could interact in song as well as comedy. Basically, this could be an expanded B&B except well rehearsed and practiced. We would need to study and evaluate early performances and carefully research what works best - throw out the bad and revise continually.

Before the show begins: It would take approximately an hour to fill the auditorium and during that time people need to be entertained and "warmed up". We could use a combination of video and personalities. Video could be excerpts from the Joy of Painting show, animal stories, The Little Painter Man fillers, etc. (all of which would be available for sale in the gift shop). Noobie the Clown could "work" the audience during this period. Noobie would interact with children as well as adults. Might hand out small gifts for the children, sample pages from a coloring book or whatever. We could also use Gary (guitar player) to wander through the crowds either singing or working with Alley (puppet). If we use Alley anywhere in the performance then we should sell small Alley puppets in the gift shop.

After the show, Bob would spend time with fans, signing autographs, photo session and chatting.

CLASSES: Classes would be set up so the customer would only have to walk into the classroom and sit down. Small (12"X16") canvas would already be locked in the easel, all tools laid out, thinner can, paper towels, etc and all paints on the palette. (We can purchase bulk paints at a very reduced cost) Have aprons and rubber gloves available for protection of clothes and hands. Has to be very up-beat, fast moving, exciting and most of all, fun. Instructors need to be trained to perform in the class - jokes to

1

tell, ways to act, dress, speak, etc.

Children's classes could be taught by our CRI "Noobie the Clown". This class, conducted in the daytime, would be ideal for parents who were looking for a babysitter for a couple of hours. Noobie, and his assistants, would entertain the children with balloons, tricks, stories and even paint a little. When the parents returned, the child would be happy, well entertained and have a completed masterpiece as a memento. The instructors would assure each parent that they had the most talented child they had ever seen, therefore assuring a substantial sale of products to take home for continued practice. Children would be given Bob Ross balloons to take with them (advertisement as they wander around Branson after the class). We could have a children's gallery available for viewing (could be open to the general public to attract customers). Could have a class art show at the end of each class, having sufficient categories to assure each child gets some kind of a ribbon. A proud parent is your best customer.

Paintings in all classes would be designed for simplicity, color and content. Paintings would be such as to assure even a first time painter, with no talent at all, would achieve satisfactory results that he/she was proud of. Paintings would be done on canvas board type stock or Masonite panels. Finished paintings would be placed in inexpensive, cardboard, wood looking frames then popped into a fitted cardboard box to protect the painting. This box would also be suitable for mailing the painting.

I believe we could do the same three or four painting over and over again. The audience changes on a daily basis and I doubt that most people would stay more than 5 days and take only one or two classes. If my figures are correct and up-to-date, Branson is attracting over 40,000 people a day on average. Most activities are set up for the evening and people are desperately looking for something to entertain them during the day and they are looking for a babysitter for their children. In all of my research about Branson, I see nothing that indicates there is any creative activities for young people and no where a parent could leave a child for a couple of hours while they shopped, took in a show or just rested. We could bring in special guest artist on occasion for the local population and to give our people a day off now and then.

MERCHANDISING:  The building should contain sufficient space to house a sales store, gallery and a place to purchase at least snacks to eat. All supplies, books, videos, etc should be available for sale in the lobby. This should be located so it is open free to the public (even if they do not see the show or take a class) and so that all customers leaving the building would have to travel through it. No other direct route out except for fire exits. Have "special" packages assembled, with different groups of materials, offered at "special" prices (savings encourage customers to buy more). We might even consider offering free

2

mailing so tourist would not have the hassle of trying to carry packages. Other items to offer: Instructional and Series Videos, Relaxation Therapy Tapes featuring Bob's voice, Tee-Shirts, Baseball Caps, Vest, Aprons, Easels, Soap on a Rope - a full range of tourist items. Might be worthwhile to offer a video of the performance or class that the customer was part of. Have most of the above items available for children, but offer an expanded line, such as: Coloring Books, Puppets, Videos made especially for children (PeaPod, Crowman, etc), instructional painting and craft videos made specifically for children, a line of non-toxic paints & cleaners, scaled down easels & palettes, Videos & coloring books of Noobie the Clown, clothes, bed spreads, towels, toothbrushes and on and on---

Have a gallery filled with paintings from Bob, Annette, Dana, Steve and other selected CRIs. Bob's paintings would be priced very high so as to make the other paintings look like a much better deal. Customers could even purchase the large painting Bob would do as part of his performance. A portion of the gallery could be set aside for more traditional paintings and paintings that reflect the Branson area. We would take a percentage of the sale price (40 to 50 percent). Could even offer a selection of signed Bob Ross prints, with or without frames that could be put together at home to save space. (We may be able to work a deal with Nick Clark to get the entire Bob Ross display from Muncie)

PROMOTION: The greatest asset we own is the Bob Ross name and image. People who go to Branson are our viewers - good, honest, salt of the earth type of people. The name alone would attract a large number of customers. Steve & Dana are both well known from television and people going to Branson are looking for celebrities they have seen on TV or in the movies. Work out deals with tour groups to bring people to you (this is one of the most effective means of promoting such a place). Bob could create a demand overnight by talking about it on the television series. Could even show excerpts of some of the events on the TV show or go as far as actually filming several shows out of each series on location (would have to be careful so we would not offend PBS). Advertise in both tourist and art magazines. Invite entire art groups to come and have a "working vacation" at Branson. Could hold our teacher reunions at this location then set up HUGE painting demonstration with a couple of hundred instructors painting at the same time (we would charge the instructors to attend such an event). We own huge mailing list of people who are interested in our style of painting (98% have purchased a product) and could do mailings. Promotion could also be accomplished through our books (about 4 million already sold) and might even offer a tear-out discount coupon to attract customers.

COST: I would suggest customers be charged $20 to $25 for a two hour class where they would leave with a completed painting. This is a very reasonable price even for a babysitter in a tourist town and very cheap for an adult since we would provide all the materials.

3

CONFIDENTIAL

BRI0000343

## - THE SHOW -

The show would basically consist of an expanded B&B lasting approximately two hours with a short intermission in the middle. The show could begin with an announcer saying something to the effect of:  Good evening ladies and gentlemen - we here at the Gettysburg Theater would like to welcome you to Bob's World .....  (lights would drop over the audience - curtain is raised - Bob comes from one side of the stage and Gary from the opposite side and meet in the middle - Gary would carry his guitar and Bob his palette)  Bob would start by singing "I love to paint"  (Gary) "I love to strum" (Bob) "Come along with us" (Gary) "We'll have some fun" (Bob talking) Hello, I'm Bob Ross (Gary) and I'm Gary Munson (Bob) We would like to welcome you to Bob's World and The Joy of Painting (Gary) and just what is Bob's World? (Bob) Bob's World is an imaginary place that lives in a paint brush and, for the next couple of hours, we would like to invite you to join us as we paint a little (Gary) and play a little (Bob) and together we'll see if we can capture the essence of only one of God's masterpieces on canvas....... (Gary) Hey Bob, I was outside before the show started and I overheard a gentleman talking to his wife (Bob) What did he say (Gary) Said he couldn't believe he'd paid good money to come in here and watch paint dry .....  Well alright, in that case let's put some paint on the canvas and watch it dry.

At this point the painting would begin..

4

BRI0000344

# EXHIBIT 2

# CROSS-PURCHASE AGREEMENT

THIS AGREEMENT is made this __12TH__ day of __DECEMBER__, 19 __89__ by and between Bob Ross, Jane Ross, Walt Kowalski and Annette Kowalski, each of whom owns, as of the date of the signing of this Agreement, a twenty-five (25.0%) percent interest in the common shares (there being no other class of stock or shares outstanding) of Bob Ross, Inc., a Virginia Corporation, and all of whom are hereinafter, collectively, "stockholders", and whose shares total one-hundred (100.0%) percent of the shares issued at the time of this Agreement, such stockholders hereby agreeing among themselves as follows:

1. PURPOSE: The purpose of this Agreement is to provide for the orderly transfer of stock and the continued orderly operation of the Company in the event of the death of one or more stockholders.  The ownership of the Company, as represented by outstanding common shares of the Company, at the time of this Agreement is as follows:

    Bob Ross . . . . . . . . . Twenty-five (25.0%) Percent
    Jane Ross . . . . . . . . . Twenty-five (25.0%) Percent
    Walt Kowalski . . . . . . Twenty-five (25.0%) Percent
    Annette Kowalski . . . . . Twenty-five (25.0%) Percent

2. DEFINITIONS:

    (a) "Remaining Stockholder" is defined as a stockholder who is not deceased.
    (b) "Purchase Price" is defined as the total amount of money (before expenses, if any) to be received by the deceased Stockholder's estate for all shares of the Company's stock owned by the deceased Stockholder.

3. OBLIGATIONS: If a Stockholder dies, all shares of the Company owned by the deceased Stockholder shall thereupon be considered as sold to the Remaining Stockholders and all of the parties hereto shall proceed as expeditiously as possible to complete the transfer of shares and consideration therefor, and all documentation connected therewith in accord with the terms hereof.

4. RESTRICTIONS: A. Upon the execution of this Agreement, the certificates of stock hereto shall be surrendered to the Company for endorsement as follows:

This certificate is transferable only upon compliance with the provisions of Cross-Purchase Agreement dated __DECEMBER 12__, 1989, a copy of which is on file in the office of the secretary of this Company.

After endorsement, the certificates shall be returned to the stockholders. All stock issued to any stockholder shall bear the same endorsement.

B. All parties acknowledge that this Agreement is not in conflict with the Articles of Incorporation or By-Laws of Bob Ross Inc. and that the Company and the Parties have waived all First Rights of Refusal or other Restrictions as far as the same may otherwise have been required with regard to this Agreement or any transaction under this Agreement.

1

CONFIDENTIAL

BRI0000470

5. OPTIONAL INSURANCE: Each Stockholder shall have the option of taking out insurance on the life of each of the other stockholders as may be desired to carry out the obligations under this Agreement.  Any such policies shall be listed in Schedule A and shall otherwise be subject to the terms of this Agreement.  Each stockholder shall be named as the direct beneficiary under the policies for which the Stockholder is the owner.

Each stockholder shall pay all premiums due on the policies so owned on the lives of the other stockholders and shall exhibit proof of payment to each respective stockholder within 15 days after the due date of each premium.  If any stockholder fails to pay a premium within fifteen days after the premium due date, the stockholder who is the insured under the policy whose premium is due may pay such premium.  Such payment shall be considered a loan to the stockholder in default, and the stockholder making the payment shall be entitled to recover such amount with interest from the date of payment at an interest rate equal to the long-term annual 120% AFR rate then in effect as issued by the IRS.

No stockholder shall during the term of this Agreement revoke or change the beneficiary designation or modify or impair any of the rights or values under his policies, nor shall any stockholder borrow against any such insurance policy or under any such insurance policy, without the consent of all other stockholders.

6. PURCHASE PRICE: The gross price of each share of stock sold by the deceased Stockholder's estate shall be determined by dividing the Company's value by the Number of shares then issued and outstanding, exclusive of any shares already subject to a redemption agreement.  The Company's value shall be determined as of the death of the Stockholder according to the following schedule:
(a) As of the date of execution hereof, the Company's value is $2,000,000.
(b) By unanimous agreement of all then-existing shareholders (exclusive of any shares in escrow subject to a redemption agreement), a prospective value may be determined.  The parties shall endeavor to review the value within 30 days of receipt of final financial statements for the year.  All financial statements shall be prepared by a C.P.A., although such statements need not be audited or certified.  Any change in value shall be in writing signed by all parties.
(c) The value set immediately preceding a Stockholder's death shall be the governing value, unless otherwise agreed to by all parties, regardless of the time interval between the death and the immediately preceding determination of value.
(d) Notwithstanding the foregoing, the parties hereto may, at any time, unanimously agree in writing to the Company's value for a given period of time.

7. COSTS: All costs of any of the parties generated directly by the death of any Stockholder and subsequent transaction shall be borne by Bob Ross Inc.

8. PAYMENT: In the event of the death of any Stockholder the Remaining Stockholders shall purchase the deceased Stockholder's stock from his estate, and his estate shall sell such stock to the Remaining Stockholders.  The

2

BRI0000471

deceased Stockholder's personal representative shall promptly transfer title of the deceased Stockholder's stock to the Remaining Stockholders in proportion to their purchases.

The Remaining Stockholders shall collect the proceeds of any insurance policies on the life of the deceased Stockholder and upon receipt of title to the deceased Stockholder's stock, shall pay such proceeds, or so much thereof as may be necessary, to the deceased Stockholder's personal representative in payment for the stock.

In the event the purchase price exceeds the insurance proceeds, or there is no insurance, the Remaining Stockholders shall pay to the personal representative of the Stockholder the remainder of the Purchaser Price by each Remaining Stockholder giving a Promissory Note, secured by the shares purchased, guaranteed by all of the Remaining Stockholders with the interest rate to be the lowest rate allowed by I.R.S. so as not to invoke the imputation of interest as required under IRC Section 1274(b) as of the Note date and adjusted annually on the anniversary date of the Note. The maximum term of the Note shall be Ten (10) years. The Note shall require payments on a monthly basis of the greater of interest accrued or One-thousand ($1,000.00) Dollars per month with a balloon payment due with the 120th payment if the Note is not fully amortized by then, such Note being prepayable without penalty and carrying a late charge of five (5.0%) Percent for any payment not made within ten days of due date.

All stock purchased by the Remaining Stockholders shall be divided between themselves in the same proportion that their shareholdings bear to each other at the date of death of the deceased Stockholder.

9. SECURITY: If a Note is given in payment for shares, the shares so purchased shall be endorsed and placed in escrow with a licensed attorney who shall release the same on a pro rata basis at the end of each payment year according to the amortization of the principal balance of the Note (with no release to be made of fractional shares) until such Note is fully paid, whereupon all remaining shares in escrow shall be delivered to the Remaining Stockholders. If default is made in payment, which default shall be noticed by the Payee of the Note with copy to the escrowing attorney, and such default thereupon remains uncured for twenty days, all shares then remaining in escrow shall be redelivered to Payee, but such redelivery shall not constitute Payee's exclusive remedy or any waiver of Payee's rights.

10. PURCHASE OF POLICIES: Upon the occurrence of the death of any Stockholder, each of the Remaining Stockholders shall have the right to purchase from the deceased Stockholder's personal representative the policy or policies on the lives of the other Remaining Stockholders exclusive of self. The purchase price shall be the surrender cash value as of the date of death, plus the pro-rata part of the gross premiums last paid before the date of death which covers the period extending beyond that date. This right shall be exercised simultaneously with the purchase of stock and otherwise shall lapse. Payment may be made by Note under the same terms as for purchase of stock.

11. MULTIPLE DEATHS: In the event of the death of all stockholders within

3

CONFIDENTIAL

BRI0000472

a single period of 30 days, then the provisions of section 7 shall not apply and this Agreement shall terminate.

12. DISSOLUTION: This Agreement shall terminate in the event of the bankruptcy, receivership or dissolution of the Company.

13. CREDITS: Any irrevocable benefit payments made by insurors on life insurance policies referenced in this Agreement to the deceased Stockholder's heirs, administrators or other representative or successor shall be credited against the amount owed to such Stockholder's estate.

14. ARBITRATION: In the event of any dispute arising hereunder, the same shall be determined by binding arbitration in accord with the Commercial Arbitration Rules of the American Arbitration Association, and the decision rendered therein entered as a judgment in any Court of competent jurisdiction.

15. BINDING: This Agreement is and shall be binding upon all of the heirs, trustees in bankruptcy, executors, administrators, committees, guardians, next friends, personal representatives, assigns, purchasers and every kind and character of successor-in-interest of each and every party hereto.

16. MODIFICATION: No modification is permitted hereto unless in writing signed by all parties.

17. GENDER: The use of masculine pronouns shall include reference to the feminine case.

18. SEVERABILITY: If any portion hereof is found to be invalid by operation of law or rule of court, then the invalid portion shall not invalidate the entire Agreement, which shall continue in full force and effect as if the invalid portion had never been a part hereof, and this Agreement shall thereafter be construed so as to carry out the previously stated Purpose.

19. GOVERNING LAW: This Agreement shall be governed by the Law of the Commonwealth of Virginia.

STOCKHOLDERS:

_____ (Seal)        _____
Bob Ross                                 Witness

_____ (Seal)        _____
Jane Ross                                Witness

_____ (Seal)        _____
Walt Kowalski                            Witness

_____ (Seal)        _____
Annette Kowalski                         Witness

4

CONFIDENTIAL

BRI0000473

The foregoing Cross-Purchase Agreement made among the Shareholders of Bob Ross, Inc. is not in conflict with the Corporation's governing instruments, and the Corporation shall co-operate in its implementation and administration.

BOB ROSS, INC.

Date: _____ 12, 1989

by: _____
        President

Attest: _____

Assistant Secretary
        (Corporate Seal)

5

CONFIDENTIAL

BRI0000474

SCHEDULE A

Annette Kowalski        Home Life Financial Assurance Corp.
                        #0620916
                        Yearly Renewable Term Life

Walter Kowalski         Home Life Insurance Co.
                        #1,127,476
                        Modified Premium Whole Life

Jane Ross               Home Life Insurance Co.
                        #1,127,475
                        Modified Premium Whole Life

Robert Ross             Home Life Insurance Co.
                        #1,129,306
                        Modified Premium Whole Life

CONFIDENTIAL
BRI0000475

## AMENDMENT TO CROSS-PURCHASE AGREEMENT

THIS AMENDMENT to Cross-Purchase Agreement is now made this _28 th_ day of _January_, 19_93_, by and between Bob Ross Inc., a Virginia Corporation, Bob Ross, Walt Kowalski and Annette Kowalski, and recites as follows:

WHEREAS, Bob Ross, Jane Ross, Walt Kowalski and Annette Kowalski entered into a Cross-Purchase Agreement related to the stock ownership of Bob Ross Inc., (hereinafter, the "Company") on December 12, 1989 (hereinafter, the "Original Agreement"); and

WHEREAS, the Original Agreement provided that the four signatories thereto each held a twenty-five (25%) percent stock interest in the Company, and further that in the event of the death of a Stockholder, all shares of the Company owned by the deceased Stockholder shall be considered as sold to the Remaining Stockholders on a pro-rata basis, for a purchase price based on the value of the Company, subject to later adjustment under the terms therein; and

WHEREAS, the Original Agreement provided that each Stockholder should have the option of purchasing insurance on the life of each of the other Stockholders to fund the signatories' respective obligations under that Agreement; and

WHEREAS, the four signatories thereto then purchased insurance policies on their lives which mistakenly named "the Trustee named in the Bob Ross, Inc. Cross Purchase Plan and Trust" or the like, as both the owner and the beneficiary of each policy, with the intent that said insurance proceeds would fund the obligations of all parties under the Original Agreement, but in fact no such Trustee was ever named, so that the policy designation of owner and beneficiary was technically inconsistent with the terms of the Original Agreement; and

WHEREAS, Jane Ross died on August 1, 1992, and pursuant to the agreement

MORRIS A. NUNES
ATTY  P.C.
7247 LEE HIGHWAY
FALLS CHURCH, VA. 22046

1

BRI0000476

of the issuing insurance company and all Remaining Stockholders, the death benefit thereon was paid in full satisfaction of all obligations of the Remaining Stockholders for payment to Jane Ross's estate in consideration for the transfer of Jane Ross's shares to the Remaining Stockholders as required by the Original Agreement; and

WHEREAS, the Remaining Stockholders now desire to amend the Original Agreement, transfer the ownership of the remaining life insurance policies (a list of which is attached hereto as Exhibit A), and modify the respective beneficiaries of each policy to correct the previous technical error and carry out the intent of the Original Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

1. The ownership of the Company, as represented by outstanding common shares of the Company, at the time of this Amendment, is as follows:

Bob Ross ............................One-Third (1/3)
Walt Kowalski..........................One-Third (1/3)
Annette Kowalski........................One-Third (1/3)

2. The parties reaffirm that in the event of the death of a Stockholder, all shares of the Company owned by the deceased Stockholder shall thereupon be considered as sold to the Remaining Stockholders.

3. The parties mutually agree and covenant that the ownership of the remaining insurance policies will be transferred so that, for example, Stockholders B and C will jointly own, in proportion to their share ownership of the Company, the policy insuring the life of Stockholder A (i.e. under current ownership percentages, Stockholders B and C would each be the fifty (50%) percent owner of that policy), and Stockholders B and C will be the joint beneficiaries of said policy in the same percentages.

4. The parties reaffirm paragraph 8 of the original Agreement which provides, in summary, that upon the death of a Stockholder, the deceased

MORRIS A. NUNES
ATTY P.C.
7247 LEE HIGHWAY
FALLS CHURCH, VA. 22046

2

CONFIDENTIAL

BRI0000477

Stockholder's personal representative shall promptly transfer title to the deceased Stockholder's stock to the Remaining Stockholders in proportion to their stock ownership, and the Remaining Stockholders shall collect the proceeds of any insurance policies on the life of the deceased Stockholder and upon receipt of title to said stock, shall pay such insurance proceeds, or so much thereof as may be necessary, to the deceased Stockholder's personal representative in payment for the stock.

Further, if the death benefit from such insurance shall be insufficient to pay the full purchase price for the deceased Stockholder's stock as provided in the Original Agreement, the remaining Stockholders shall remain liable for any deficiency in the same manner, with the same payment formula as prescribed in paragraph 8 of the Original Agreement. If the death benefit shall exceed the purchase price prescribed under the Agreement, the Remaining Stockholders shall be entitled to retain any such excess, without obligation therefor to the personal representative of the deceased Stockholder.

5. In all other respects, the Original Agreement is hereby ratified and confirmed by the parties hereto, as remaining in full force and effect.

WITNESS the following signatures and seals:

BOB ROSS INC., a Virginia Corporation:

By: _____ (Seal)
      Authorized Signatory

STOCKHOLDERS:

_____ (Seal)    _____
Bob Ross                                              Witness

_____ (Seal)    _____
Walt Kowalski                                      Witness

_____ (Seal)    _____
Annette Kowalski                                Witness

MORRIS A. NUNES
ATTY  P.C.
7247 LEE HIGHWAY
FALLS CHURCH, VA. 22046

3

BRI0000478

The foregoing Amendment to Cross-Purchase Agreement made among the Stockholders of Bob Ross Inc. is not in conflict with the Company's governing instruments, and the Company shall co-operate in its implementation and administration.

BOB ROSS INC.

Date: _January 28, 1993_     By: _____
                                          President

ATTEST:

_____
Assistant-Secretary

CONFIDENTIAL

BRI0000479

STOCK TRANSFER AGREEMENT AND
AMENDMENT TO THE BOB ROSS INC. CROSS-PURCHASE AGREEMENT

THIS AGREEMENT is made this 11th day of July, 1994 by and between

BOB ROSS INC., a Virginia Corporation (hereinafter referred to as the

"Company"), ROBERT N. ROSS ("Bob"), ROBERT N. ROSS, Trustee of the ROBERT N.

ROSS REVOCABLE TRUST, dated May 12, 1994 ("Trustee"), WALTER J. KOWALSKI

("Walt"), and ANNETTE H. KOWALSKI ("Annette"), and recites as follows:

WHEREAS, Bob, Walt and Annette are all of the shareholders of the Company,
in equal shares; and

WHEREAS, the shareholders are parties to a Cross Purchase Agreement, as
amended, on file at the offices of the Secretary of the Company; and

WHEREAS Bob wishes to transfer and assign his shares in the Company to the
Trustee, in trust; and

WHEREAS, the Company, and Walt and Annette individually, wish to waive any
right they may have to first refusal to purchase Bob's shares upon a desired
transfer of those shares, as to this transfer only;

NOW, THEREFORE, for good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, the parties agree as follows:

1. All of the above recitals are incorporated herein by reference.

2. The Company, by authorized signatory, and Walt and Annette
individually, hereby waive any right of first refusal to purchase said shares,
as to this transfer only.

3. Bob hereby transfers all of his shares in the Company to Trustee and
Trustee accepts same and agrees to be bound by all terms and obligations of the
Bob Ross Inc. Cross-Purchase Agreement, as a party to that Cross-Purchase
Agreement.

4. In the event of the death of Bob, Walt or Annette, Trustee (including
successors) shall have the same obligations under the Cross-Purchase Agreement

CONFIDENTIAL

BRI0000480

to sell the decedent's shares (or shares held by the assignee of the decedent) to the surviving stockholders, or to purchase the decedent's shares as a surviving stockholder, in the same manner as existed prior to this transfer and amendment, notwithstanding the potential continued existence of the Trust.

5. All parties agree to execute any additional documents or provide further assurances to accomplish the purposes herein.

6. In all other respects, the Cross-Purchase Agreement is hereby ratified and confirmed.

WITNESS the following signatures and seals:

_____ (Seal)
ROBERT N. ROSS

_____ (Seal)
ROBERT N. ROSS, Trustee of the
ROBERT N. ROSS REVOCABLE TRUST,
dated May 12, 1994

_____ (Seal)
WALTER J. KOWALSKI

_____ (Seal)
ANNETTE H. KOWALSKI

BOB ROSS INC.

By _____ (Seal)
Authorized Signatory

State of Florida                ,
City/County of Winter Park | Orange, to wit:

The foregoing was acknowledged before me this 11th day of July,
1994 by Robert N. Ross, for himself and as Trustee of the Robert N. Ross
Revocable Trust, dated May 12, 1994, who has produced Florida Driver's License
No. R200-774-42-389 as identification.

_____ (Seal)
Notary Public

My Comm. Expires: 10-20-96

2

OFFICIAL SEAL
BARBARA J. SMITH
My Commission Expires
Oct. 20, 1996
Comm. No. CC 237163

BRI0000481

State of _Virginia_,
City/County of _Fairfax_, to wit:

   The foregoing was acknowledged before me this _19th_ day of _August_,
1994 by Walter J. Kowalski.         _Brenda Mull_         (Seal)
                                     Notary Public

My Comm. Expires: _July 31, 1995_

State of _Minnesota_,
City/County of _Olmsted_, to wit:

   The foregoing was acknowledged before me this _11th_ day of _August_,
1994 by Annette H. Kowalski.        _Laraine X Rit_
                                     Notary Public        LARAINE R. RITCHIE
                                                          NOTARY PUBLIC-MINNESOTA
                                                          OLMSTED COUNTY
                                                          My Comm. Expires 2/6/1997
My Comm. Expires: _2-6-97_

State of _Virginia_,
City/County of _Fairfax_, to wit:

   The foregoing was acknowledged before me this _19th_ day of _August_,
1994 by _WALTER J. KOWALSKI_ authorized signatory for Bob Ross Inc.

                                     _Brenda Mull_         (Seal)
                                     Notary Public

My Comm. Expires: _July 31, 1995_

3

CONFIDENTIAL

BRI0000482